## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| ROBERT NEWKIRK, | : | CIVIL ACTION NO. 1:16-CV-332 |
| | : | |
| Plaintiff, | : | Hon. Robert J. Jonker |
| | : | |
| v. | : | |
| | : | |
| CONSOLIDATED RAIL CORPORATION | : | JURY TRIAL DEMANDED |
| and NORFOLK SOUTHERN RAILWAY | : | ORAL ARGUMENT REQUESTED |
| COMPANY, | : | |
| | : | |
| Defendants. | : | |

**APPENDIX SUPPORTING DEFENDANTS MOTION FOR PARTIAL SUMMARY JUDGEMENT AS TO PLAINTIFF'S LOCOMOTIVE INSPECTION ACT CLAIMS AND MOTION TO EXCLUDE PLAINTIFF'S EXPERT, GEORGE GAVALLA**

Defendants submit true and correct copies of the following materials in support of their Motion for Summary Judgment on Plaintiff's Locomotive Inspection Act Claims and the Motion to Exclude Plaintiff's Expert, George Gavalla.

| EXHIBIT | DESCRIPTION |
|---|---|
| A | February 8, 2017 Deposition of Robert Newkirk |
| B | December 11, 2016 Expert Report of George Gavalla |
| C | March 31, 2017 Deposition of George Gavalla |
| D | Affidavit of Edward W. Pritchard |
| E | Federal Register, Volume 77, dated April 9, 2012 |
| F | April 4, 1996 correspondence from E. English to W. Honeycutt |
| G | March 1, 1996 correspondence from W. Honeycutt to E. English |
| H | Locomotive Crashworthiness and Cab Working Conditions Report to Congress |
| I | FRA's Motive Power and Equipment Compliance Manual |

| | |
|---|---|
| J | 69 Fed. Reg. 63890 |
| K | 45 Fed. Reg. 21098 |
| L | January 19, 1990 correspondence from G. McBride to R. Knudsen |
| M | February 11, 2016 Order in *Harris v. Norfolk Southern Railway Company* |

Respectfully submitted,

**BURNS WHITE LLC**

/s/  David A. Damico
David A. Damico, Esquire
Attorneys for Defendant,
Consolidated Rail Corporation
Burns White Center
48 26th Street
Pittsburgh, PA  15222
(412) 995-3000
dadamico@burnswhite.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| ROBERT NEWKIRK, | : | CIVIL ACTION NO. 1:16-CV-332 |
| | : | |
| Plaintiff, | : | Hon. Robert J. Jonker |
| | : | |
| v. | : | |
| | : | |
| CONSOLIDATED RAIL CORPORATION | : | JURY TRIAL DEMANDED |
| and NORFOLK SOUTHERN RAILWAY | : | |
| COMPANY, | : | |
| | : | |
| Defendants. | : | |

## <u>ORDER</u>

**AND NOW**, this _____ day of _____, 2017, upon consideration of Defendants Consolidated Rail Corporation and Norfolk Southern Railway Company's Motion for Summary Judgment, and any response thereto, it is hereby **ORDERED** and **DECREED** that said Motion is **GRANTED.**  Plaintiff's claims under the Locomotive Inspection Act, 49 U.S.C. §20701, *et seq.* (Counts II and IV) are hereby dismissed with **PREJUDICE** as to Defendants Consolidated Rail Corporation and Norfolk Southern Railway Company.

BY THE COURT:

_____

Transcript of Robert Newkirk
Conducted on February 8, 2017

1 (1 to 4)

---

**Page 1**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

```
ROBERT NEWKIRK,              )
        Plaintiff,           )
vs.                          )   Case No. 1:16-CV-332
CONSOLIDATED RAIL            )
CORPORATION, et al,          )
        Defendants.          )
---------------------------------------------
```

DEPOSITION OF ROBERT NEWKIRK

Taken on the part of the Defendant, at the offices of Petrucelli & Waara, P.C., 328 West Genesee Street, Iron River, Michigan, on Wednesday, February 8, 2017, at about 10:02 a.m. CST

APPEARANCES:

For the Plaintiff:   Mr. Vincent R. Petrucelli (P30055)
                     Petrucelli & Waara, P.C.
                     328 West Genesee Street
                     P.O. Box AA
                     Iron River, MI 49935
                     (906)265-6173

For the Defendant:   Mr. Patrick M. Horvat
                     Burns, White, L.L.C.
                     Four Northshore Center
                     106 Isabella Street
                     Pittsburgh, PA 15212
                     (412)995-3026

Reported by:   Sandra A. Larson, CSR-2916, RMR

---

**Page 2**

TABLE OF CONTENTS

ROBERT NEWKIRK

Examination by Mr. Horvat . . . . . . . . . . . . . 3
Examination by Mr. Petrucelli . . . . . . . . . .141
Examination by Mr. Horvat . . . . . . . . . . . .164
Examination by Mr. Petrucelli . . . . . . . . . .171

EXHIBITS

Exhibit A - list of medications. . . . . . . . . .106
Exhibit B - Reynolds Clinic progress notes . . . .118
Exhibit C - Dr. Weeks office visit form dated
            10-18-11. . . . . . . . . . . . . . .120
Exhibit D - Bayside Allergy report dated 4-14-13 .125
Exhibit E - letter from Dr. Knitter dated 11-26-13 .169

---

**Page 3**

1    Iron River, Michigan

2    Wednesday, February 8, 2017 - 10:02 a.m. CST

3            ROBERT NEWKIRK

4    having been first duly sworn, was examined and

5    testified on his oath as follows:

6            EXAMINATION

7    BY MR. HORVAT:

8    Q   Mr. Newkirk, have you ever had your deposition taken

9        before?

10   A   Yes.

11   Q   Okay. How many times have you had it before?

12   A   I am not really sure, about three --

13   Q   Okay.

14   A   -- I would say.

15   Q   So you kind of know how this is going to go; right?

16   A   Yeah.

17   Q   Since she is taking everything down, we may have a

18       tendency to talk over one another, or you may know my

19       question before I ask it. Unfortunately, she can only

20       take one of us down at a time, so try to let me finish

21       my question, and I will certainly forward you that

22       courtesy.

---

**Page 4**

1    A   That will be a job.

2    Q   If you don't know an answer to a question, "I don't

3        know" is a perfectly good answer. I am obviously going

4        to be asking you questions that cause you to reach back

5        in your memory. I don't want you guessing, but if you

6        estimate, just let me know, and that's fine. All

7        right?

8    A   (Witness nodded head.)

9    Q   If you need to use the restroom, water, whatever you

10       need, just speak up. You're not bolted to your chair

11       or anything like that, so just let me know, and we will

12       be happy to accommodate you.

13   A   Thank you.

14   Q   You said -- Can you state your name for the record?

15   A   Robert Rex Newkirk.

16   Q   And just the last four digits of your Social Security

17       Number?

18   A   3649.

19   Q   Okay. And your current address?

20   A   6369 Morgan Road; Osseo, Michigan. 49266, I believe,

21       but I'm going to make sure here.

22   Q   All right. That's fine.


DEFENDANT'S EXHIBIT A

Transcript of Robert Newkirk
Conducted on February 8, 2017

---

9

1  A   I think.
2  Q   That's all right. You didn't have your deposition
3      taken for that?
4  A   No.
5  Q   Okay. And what was the result of that suit or claim?
6  A   25,000.
7  Q   Okay. And you retired from the railroad in 2005?
8  A   Yeah.
9  Q   Okay. Regular retirement?
10 A   No, disability.
11 Q   Disability. And that was as a result of that
12     explosion?
13 A   Yes.
14 Q   And the 2005 disability reason why you left the
15     railroad, it has nothing to do with your COPD or
16     anything like that; is that correct?
17 A   No, sir.
18 Q   That is correct?
19 A   Correct. Nothing, yeah.
20 Q   Nothing to do with this current lawsuit?
21 A   Yeah.
22 Q   How long have you lived at -- on Morgan Street or

---

10

1      Morgan Avenue there?
2  A   Since December 31st of 2016.
3  Q   All right. Do you recall any of your railroad I.D.
4      numbers?
5  A   My employee number was 261494.
6  Q   Was that for Conrail and NS?
7  A   Yeah. That's my hiring out number.
8  Q   Okay. And I don't believe I asked you, and I
9      apologize, your date of birth?
10 A   June 6, 1956.
11 Q   And you're currently 60 years old?
12 A   Yes, sir.
13 Q   Okay. What kind of home do you live in on Morgan?
14 A   It is on Bird Lake.
15 Q   Is it a home, trailer?
16 A   It is a house.
17 Q   Okay. Do you live there by yourself?
18 A   No.
19 Q   Okay. Who else lives there with you?
20 A   John Barwiller.
21 Q   Could you spell Mr. Barwiller's name?
22 A   Just like it sounds.

---

11

1  Q   B-A-R?
2  A   W-I-L-L-E-R.
3  Q   Has he lived there for an extended period of time, or
4      you guys just moved in there?
5  A   Yes.
6  Q   Okay. Do you own that home or --
7  A   No.
8  Q   -- do you just stay there?
9  A   Yeah. I rent a room from him when I am there.
10 Q   Okay. You rent a room from him?
11 A   Yeah.
12 Q   Okay. Mr. Barwiller, did he ever work for the
13     railroad?
14 A   Yes. He is an on disability engineer also.
15 Q   Do you know what he is on disability for?
16 A   His heart, I believe.
17 Q   Did you ever work with Mr. Barwiller?
18 A   No.
19 Q   How did you come to meet Mr. Barwiller or learn of him?
20 A   When I started working out of Bryan, Ohio.
21 Q   For the railroad?
22 A   Yes. He is a Toledo NS man.

---

12

1  Q   Do you know when he left the railroad, by chance,
2      Mr. Barwiller?
3  A   No, I do not.
4  Q   Do you have any idea when he started with the railroad?
5  A   In the '60s. He is an NYC man.
6  Q   Okay. Do you know what railroad he was working for
7      when he left?
8  A   NS.
9  Q   Okay. Do you own any property or any homes anywhere
10     else?
11 A   Nope.
12 Q   Okay. So you don't own any homes?
13 A   No.
14 Q   Or property?
15 A   No.
16 Q   Okay.
17        MR. PETRUCELLI: You mean real property?
18 Q   (By Mr. Horvat) Yes, real property, excuse me, real
19     property, like land or --
20 A   (By the Witness) No.
21 Q   Okay. What was the last home you owned?
22 A   2265 North Manistee River Road; Grayling, Michigan,

---

Transcript of Robert Newkirk
Conducted on February 8, 2017

---

**5**

1   A   Because I could be wrong. 49266.
2   Q   All right. You have mentioned you had your deposition
3       taken three -- you know, approximately three times
4       before. What were they for?
5   A   Injuries.
6   Q   Okay. When was the first deposition you had?
7   A   I am not sure of the date, I believe around '96.
8   Q   Okay. That's, like I said, I assume you are estimating
9       about that time?
10  A   That's estimating.
11  Q   Okay. And I assume you had an attorney for that one?
12  A   Yes.
13  Q   Okay. Who was your attorney?
14  A   Coffey and Kaye.
15  Q   Is that C-A-Y-E, Coffey and Kaye?
16  A   Yeah.
17  Q   Coffee, like the drink?
18  A   Yeah.
19  Q   Okay.
20  A   Well, they are out of Philly.
21  Q   Okay. And what was that injury for?
22  A   My neck.

---

**6**

1   Q   And that was an injury on the railroad?
2   A   Yes.
3   Q   And what was the result of that suit?
4   A   Settled out of court.
5   Q   Okay. Do you recall approximately how much that was
6       for?
7   A   One hundred thousand.
8   Q   Do you know who the counsel for the railroad was, by
9       chance?
10  A   No, I do not.
11  Q   Okay. The second time you had your deposition taken,
12      when was that?
13  A   E.J. Leizerman.
14  Q   Out of Toledo?
15  A   Yes.
16  Q   Do you remember approximately when that was? You can
17      estimate, like the decade or something like that, as
18      well.
19  A   I think it was probably around 2007 --
20  Q   Okay.
21  A   -- estimating.
22  Q   Okay. Was it after you left the railroad?

---

**7**

1   A   Yes.
2   Q   Okay. And what did you -- What was the reason for your
3       deposition?
4   A   I got hurt at the hotel in Chicago.
5   Q   Was this the explosion?
6   A   Yeah.
7   Q   Okay. Tell me a little bit about that, that situation,
8       that incident at the hotel in Chicago.
9   A   Walking out of the hotel with two other people, and
10      Jimmy Vangel seen the trash can smoking, so he went to
11      the front desk to tell them. And I can't even remember
12      who the other person was, but me and him kept walking,
13      and we were underneath the canopy, outside of the
14      doors, when it blew-- when it blew up.
15  Q   Okay.
16  A   And Jimmy was coming out the doors. And when he hit
17      the doors, I turned around real fast to look, because
18      that's when the explosion happened, and that's how that
19      happened.
20      MR. HORVAT: Okay. Off the record.
21      (Discussion off the record.)
22  Q   (By Mr. Horvat) And you said Mr. Vangel, V-A-N-G-E-L?

---

**8**

1   A   (By the Witness) Yeah.
2   Q   Okay. He was a coworker of yours?
3   A   Yes, an engineer in the same pool.
4   Q   Okay. Do you know where Mr. Vangel lives?
5   A   Not offhand, no. It has been quite awhile since I have
6       mingled with them people, since 2005, so --
7   Q   Okay. And what was the result of that?
8   A   Settled out of court.
9   Q   Okay. Approximately for how much?
10  A   500,000.
11  Q   And the last time you had your deposition taken?
12  A   That was the last time.
13  Q   Okay. Okay. So it was just these two times that you
14      remember?
15  A   To the best of my ability, I am pretty sure that's --
16      this is the third.
17  Q   Okay. Did you also have a hearing loss suit, as well?
18  A   Yes, I did.
19  Q   And do you recall who your attorney was for that?
20  A   I can't think of his name, but the firm I think was
21      Provizer, Lichtenstein out of Detroit.
22  Q   Okay.

Transcript of Robert Newkirk
Conducted on February 8, 2017

13

1    49738.
2  Q   And how long did you live at that one?
3  A   **Since 2011.**
4  Q   When did you sell that home?
5  A   **December 30th, 2016.**
6  Q   Okay.  And you owned that home?
7  A   **Yeah.**
8  Q   Did you build or help build that home?
9  A   **No.**
10 Q   Whenever you lived there, for that approximately five
11     years, did you do any home improvements or any
12     remodeling?
13 A   **Yes.**
14 Q   Okay.  What kind of improvements or remodeling did you
15     do?
16 A   **The fireplace, I had to have the fireplace tore down**
17     **and redid.**
18 Q   Did you do any of that work yourself?
19 A   **No.**
20 Q   Okay.  Any other home improvement projects on that home
21     that you can recall?
22 A   **No, just basic stuff.**

14

1  Q   Did you have issues with the carpet there?
2  A   **Yeah.  Yes.**
3  Q   Did you take it out, rip out the carpet?
4  A   **Yeah.**
5  Q   Okay.
6  A   **Yeah.**
7  Q   Did you put new carpet in?
8  A   **No.  I put granite in front of the fireplace.**
9  Q   Okay.
10 A   **I had granite installed.**
11 Q   Was there something wrong with the carpet?
12 A   **I was told that it had dust mites there.**
13     (Discussion off the record.)
14 Q   (By Mr. Horvat)  What does LP stand for?
15 A   **(By the Witness)  Low Pressure.**
16 Q   Okay.
17 A   **First dog I have ever delivered.  And he was in a sac**
18     **and I was taking my time, really gingerly.  And the**
19     **lady next door come over, and looked at it, and ripped**
20     **the thing off.  She had to suck the stuff to get him to**
21     **breathe, so I figured he might be a little damaged.  So**
22     **I named him Low Pressure, and I decided I had to keep**

15

1     him.
2  Q   The --
3          MR. PETRUCELLI:  He doesn't seem brain
4      damaged to me.
5          THE WITNESS:  No, he's not.
6  Q   (By Mr. Horvat)  The Manistee home, what kind of heat
7      was in that home if you recall?
8  A   **(By the Witness)  It had a boiler, and it had forced**
9      **air, and it had a fireplace.**
10 Q   Okay.  Wood burning fireplace?
11 A   **Yes.**
12 Q   Did you ever do any work on the boiler?
13 A   **No.**
14 Q   What kind of roof was on that home?
15 A   **Metal.**
16 Q   Okay.  An insulated home?
17 A   **Yes.**
18 Q   Okay.  Do you know what kind of insulation was in
19     there?
20 A   **Not right offhand.**
21 Q   That's fine.  The next house you lived in --
22 A   **At Bird Lake?**

16

1  Q   Did you live at -- Wait one second here -- Averill
2      Avenue Southwest, Wyoming, Michigan?
3  A   **Oh, that was my mother and father's house.**
4  Q   Is that the house you grew up in?
5  A   **Yeah.**
6  Q   When did you move out?
7  A   **When they put my mom in a home, when my sister put my**
8      **mother in a home.**
9  Q   And you lived there from approximately 2009 to 2011?
10 A   **Yes.**
11 Q   Is that the house you grew up in?
12 A   **Yes.**
13 Q   Okay.  So you lived there in two stints I guess,
14     whenever you grew up and then moved out, and when you
15     moved back from 2009 to 2011?
16 A   **Yeah.  Yes.  Excuse me.**
17 Q   That's okay.  The first time, whenever you were growing
18     up, what age did you move out of that home, if you
19     recall?
20 A   **I think about 19.**
21 Q   Okay.
22 A   **That's a guess.**

Transcript of Robert Newkirk
Conducted on February 8, 2017

17

1  Q   I mean you can estimate.  I mean that's fine.  I mean
2       that's an educated guess, I guess you could say.  Was
3       the house built whenever you were there?  Was it
4       already built I guess?
5  A   It was already there.
6  Q   Did you ever do any home remodeling on that home,
7       during that first stint?
8  A   No, I did not.
9  Q   How was that home heated?
10 A   Forced air.
11 Q   I assume it was still forced air whenever you moved
12      back in, in 2009; correct?
13 A   Yes, correct.
14 Q   Did you do any work on it the second time you lived
15      there?
16 A   No.
17 Q   Okay.  The next home you lived in would have been on
18      Hill Avenue in Toledo?
19 A   Yes.
20 Q   That's 3601 Hill Avenue, No. 8?
21 A   Yes.
22 Q   Is that --

18

1  A   88.
2  Q   88, excuse me.  Okay.
3  A   And that was a trailer.
4  Q   Okay.  You lived there for about eight years?
5  A   Yeah.
6  Q   Sound about right?
7  A   Sounds about right.
8  Q   All right.  From 2001 to 2009?
9  A   Yeah.
10 Q   Did you ever do any kind of work on that trailer, any
11      remodeling or anything like that?
12 A   I didn't.  I paid a neighbor to.
13 Q   Okay.  What kind of work did he do or he/she do?
14 A   Just put in -- took up the carpet and put in wood
15      floors.
16 Q   Okay.  How was that trailer heated?
17 A   Forced air, I believe.
18 Q   Okay.  You lived on Secor Road in Toledo for a little
19      bit?
20 A   Yes.
21 Q   Do you know how long you lived there?
22 A   Not quite a year.

19

1  Q   Okay.
2  A   Estimate.
3  Q   Is that a home?
4  A   No, it was an apartment.
5  Q   Okay.
6  A   With John Barwiller.
7  Q   Okay.
8  A   And that had --
9  Q   How was it heated?
10 A   Baseboard.
11 Q   I assume you didn't any work on that home or
12      anything, being an apartment?
13 A   No, no.
14 Q   Excuse me.  Okay.  And I am estimating here, would that
15      have been about 2000 or 2001, somewhere in that
16      neighborhood?
17 A   Yeah.
18 Q   Okay.  I am just going in chronological order there.
19 A   I understand.
20 Q   Then you lived in Osseo, Michigan?
21 A   Yeah.
22 Q   Is that -- Did I pronounce that correctly?

20

1  A   Yeah.  That's the place where I am at when I am here --
2       I mean there --
3  Q   Okay.
4  A   -- now.
5          MR. PETRUCELLI:  I thought it was Osseo.
6          THE WITNESS:  Osseo, yeah.
7          MR. PETRUCELLI:  But --
8          THE WITNESS:  O-S-S-E-O.  Yeah.
9  Q   (By Mr. Horvat)  That's Mr. Barwiller's home?
10 A   (By the Witness)  Barwiller, yeah.
11 Q   Does Mr. Barwiller smoke?
12 A   No.
13 Q   Has he ever smoked?
14 A   Yeah, he used to smoke.
15 Q   Do you know when he quit at all?
16 A   It's been quite a long time ago.
17 Q   And you lived in Elkhart, Indiana, on Wildwood Avenue?
18 A   Yes.
19 Q   How long did you live there, in Elkhart?
20 A   Not quite a year.
21 Q   Okay.  Apartment, trailer?
22 A   Trailer.

Transcript of Robert Newkirk
Conducted on February 8, 2017

6 (21 to 24)

**21**

1  Q  Okay.  Did you ever do any kind of work on that
2     trailer?
3  A  No, sir.
4  Q  Okay.  And you lived in Allentown?
5  A  Yeah.
6  Q  Allentown, Pennsylvania?
7  A  Yeah.
8  Q  Do you know when you lived in Allentown?
9  A  Not really.  It was when the auto industry went down.
10    I think it was in the '80s, to the best of my ability.
11    It was --
12 Q  Yeah.
13 A  Yeah.
14 Q  That's fine.  Was it a home, trailer?
15 A  An apartment.
16 Q  Okay.  What brought you to Allentown, Pennsylvania?
17 A  Work.
18 Q  You worked for the railroad?
19 A  Yeah.
20 Q  You worked for Conrail at the time?
21 A  Yes.
22 Q  Anybody live in that apartment with you?

**22**

1  A  Dick Migwan (phonetic spelling).
2  Q  I am going to have to ask you to spell that one.
3  A  You got me.
4  Q  Could you say it one more time?
5  A  Migwan.
6  Q  Did Dick work for the railroad?
7  A  Yes.
8  Q  Okay.
9  A  He is a Central New Jersey guy.
10 Q  You never worked for the CNJ, did you?
11 A  No.
12 Q  That's what I thought, okay.  I assume he was working
13    for Conrail, as well?
14 A  Yes.
15 Q  What did he do for the railroad, Dick?
16 A  Engineer.
17 Q  Same pool as you?
18 A  No.
19 Q  Okay.  Did you ever work with Dick?
20 A  No.
21 Q  Okay.  How long did you live in Allentown?
22 A  Not quite a year.

**23**

1  Q  Did you live with anybody in Elkhart?
2  A  A lady named Peggy.
3  Q  Okay.
4  A  I rented a room from her.
5  Q  Oh, okay.
6  A  And I don't know her last name.
7  Q  That's fine.  Within -- Was that the first home you
8     lived in after moving out of your family home, that
9     Allentown, PA, home?
10 A  No.
11 Q  Okay.  Do you recall any of the other --
12 A  I don't remember the addresses, but the cities was
13    Kentwood.
14 Q  Kentwood?
15 A  Yes.
16 Q  Is that in Michigan?
17 A  Yes.
18 Q  Okay.
19 A  It is right next to Wyoming.
20 Q  Okay.  How long did you live in Kentwood, if you
21    recall?
22 A  A year, year-and-a-half.

**24**

1  Q  Okay.  Did you own that home?
2  A  No.  It was an apartment.
3  Q  Okay.  And did you live by yourself, or did you have a
4     roommate?
5  A  No.  I was married.
6  Q  Okay.  Did you also live in Grand Rapids?
7  A  Yes.
8  Q  On Woodfield East Drive?
9  A  That would be Kentwood.
10 Q  Okay.  Okay.  And your family home growing up, you
11    lived there until about you were 19, roughly?
12 A  Right.
13 Q  Who lived there when you were growing up?
14 A  My mother, my father, and I had two sisters, Vicki and
15    Linda.  And they moved out when they were 18, they got
16    married and left.
17 Q  Okay.
18 A  And they are both older than me.
19 Q  Okay.  When were you married?
20 A  '78, '79.
21 Q  And how long were you married for?
22 A  Not long.

Transcript of Robert Newkirk
Conducted on February 8, 2017

---

**25**

1  Q   Okay.
2  A   About two years, till about '80.  When I come back from
3      Allentown, it was done.
4  Q   So about '80, '81?
5  A   Yeah.
6  Q   And your ex-wife's name?
7  A   Jeri.
8  Q   G-E-R-I?
9  A   G — J-E-R-I.
10 Q   And what's Jeri's maiden name?
11 A   Eastman.  And she passed about a year-and-a-half ago.
12 Q   Do you know what she passed away from?
13 A   She had a real rare skin disease, and it hardened her
14     balls-— her insides, and they burst, and that's how
15     she died.
16 Q   Do you know how old she was when she passed?
17 A   Probably 55.
18 Q   Okay.  Only marriage?
19 A   Only marriage.
20 Q   Okay.  Did Jeri smoke?
21 A   No.
22 Q   Did Jeri work?

---

**26**

1  A   Yes.
2  Q   What did she do?
3  A   She worked at Steelcase.
4  Q   Steelcase?
5  A   Steelcase.
6  Q   What's that?
7  A   It is a furniture manufacturer in Grand Rapids.
8  Q   Okay.
9  A   Office furniture.
10 Q   Okay.  Did you guys have kids together?
11 A   Yes, a daughter.
12 Q   Okay.  Her name?
13 A   Mandy.
14 Q   Is Mandy married?
15 A   Yes.
16 Q   What's her married name?
17 A   S-O-T-A, Sota.
18 Q   And where does Mandy live?
19 A   Bradenton, Florida.
20 Q   Smart girl.  It's beautiful down there, the weather is
21     beautiful.
22         MR. PETRUCELLI: If you like hot, muggy

---

**27**

1      weather.
2          MR. HORVAT:  I went to law school in Florida,
3      so it doesn't bother me.
4          MR. PETRUCELLI: Oh.
5          MR. HORVAT:  I don't mind the heat.
6  Q   (By Mr. Horvat)  How old is Mandy?
7  A   (By the Witness) Thirty-eight.
8  Q   Does she work?
9  A   Yeah.
10 Q   What does she do?
11 A   She is like a fitness instructor.
12 Q   And what's her husband's name?
13 A   Louis.
14 Q   And what's Louis do?
15 A   He works selling medical equipment.
16 Q   Okay.  Is Mandy a smoker?
17 A   No.
18 Q   That seems like --
19          MR. PETRUCELLI:  It would be kind of
20      counterintuitive to a fitness instructor.
21          MR. HORVAT:  That's what I was just about to
22      say.

---

**28**

1  Q   (By Mr. Horvat)  Is Louis a smoker?
2  A   (By the Witness)  No.
3          MR. PETRUCELLI:  You should ask is LP a
4      smoker.  No, sorry.
5  Q   (By Mr. Horvat)  Do you have any grandkids?
6  A   (By the Witness)  Layla.
7  Q   Okay.  How old is Layla?
8  A   She just turned two.
9  Q   Does Layla have any health issues or anything like
10     that?
11 A   No, not that I know of.
12 Q   Okay.  Any breathing problems or anything like that,
13     that you know of?
14 A   No.
15 Q   How about Mandy, does she have any breathing problems?
16 A   No.
17 Q   Any forms of cancer has she ever been diagnosed with?
18 A   She had breast cancer.  She had both of her breasts
19     removed, reconstructive surgery, and she has been in
20     remission or cancer free now for a few years.
21 Q   That's great.  Mandy your only child?
22 A   I have a son —

Transcript of Robert Newkirk
Conducted on February 8, 2017

**29**

1  Q  Okay.
2  A  -- named Kyle.  I wasn't married to his mother.
3  Q  Okay.  Is Kyle's last name Newkirk?
4  A  No.
5  Q  What's his last name?
6  A  Koetje.
7  Q  Could you spell that?
8  A  K-O-E-T-J-E.
9  Q  Where does Kyle live?
10 A  I haven't -- I don't have a clue.
11 Q  Okay.  Do you know approximately how old Kyle is?
12 A  Twenty-six.
13 Q  Okay.  His mother, what's her name?
14 A  Maria.
15 Q  Same last name?
16 A  Yeah.
17 Q  Okay.  Do you have any idea where Maria lives?
18 A  No.
19 Q  Do you have any idea if she is still alive, Maria?
20 A  No, I do not.
21 Q  Okay.  Do you have any idea what Kyle does for a
22     living?

**30**

1  A  No, I do not.
2  Q  Kyle and your daughter your only two children?
3  A  Yes.
4  Q  Is your daughter in any way financially dependent upon
5     you?
6  A  No.  They do pretty good.
7  Q  Okay.
8  A  But they are kids, and they can always use help.
9  Q  Well, sure.  Kyle, was he diagnosed with asthma, that
10    you know of?
11 A  I am not sure.
12 Q  Okay.
13 A  It has been so long since I have --
14 Q  Okay.  When is the last time you spoke with Kyle that
15    you know of, that you can recall?
16 A  I am not sure.  I couldn't even guess and give you a
17    ballpark figure.
18 Q  Okay.
19 A  I know that sounds bad but --
20 Q  You are just being honest.  That's all I ask.  I
21    appreciate that.  Your father's name, what was his
22    name?

**31**

1  A  Russell R.
2  Q  Two Ss, two Ls?
3  A  I believe so.
4  Q  All right.  Is your father deceased?
5  A  Yes.
6  Q  Okay.  How old was he when he passed?
7  A  I believe 78.
8  Q  Okay.  Do you know what he passed away from?
9  A  Not really.
10 Q  Okay.  Heart disease?
11 A  Could be.
12 Q  Okay.  I am not putting words -- If you don't know --
13 A  Well, it could very well be.  I really don't know the
14    technical term.  I called him dad, and when he is gone,
15    he is gone.  That's --
16 Q  Was your father a smoker?
17 A  He did, yes.  But he quit for probably 20, 25 years
18    before he passed.
19 Q  Okay.  Do you know what type of cigarettes he smoked?
20 A  No.
21 Q  Okay.  Did he smoke in the family home growing up?
22 A  No, not really.  If he did, well, I was outside.

**32**

1  Q  Okay.  What did your dad do for a living?
2  A  Railroad.
3  Q  Okay.  What was his job title?
4  A  Car inspector.
5  Q  Where did he work at?
6  A  Grand Rapids.
7  Q  Did he work at Grand Rapids the entire time?
8  A  He went all over for them.
9  Q  Okay.  Do you know when he retired from the railroad,
10    your dad?
11 A  No, I don't.
12 Q  Do you know what railroad he was working for when he
13    retired?
14 A  Conrail.
15 Q  Okay.  Do you know what decade it would have been he
16    retired?
17 A  Probably in the '90s.  Could be in the early '80s -- or
18    late '80s, too.
19 Q  Okay, that's fine.  Was your dad ever diagnosed with
20    any forms of cancer?
21 A  Prostate cancer.
22 Q  Was your dad ever diagnosed with any breathing

Transcript of Robert Newkirk

Conducted on February 8, 2017

---

**33**

1   problems?

2   A   No.

3   Q   Okay.  Did he ever have any breathing problems that you

4       noticed?

5   A   Not that I am aware of.

6   Q   Okay.  Do you know if your dad ever filed suit against

7       the railroad?

8   A   I don't believe so.

9   Q   Okay.

10  A   Do you know, he did have a breathing problem.  I

11      apologize about that.

12  Q   That's all right.

13  A   He was on oxygen before he died.  That's -- Yeah.

14  Q   That's all right, I appreciate it.  Do you know if he

15      was formally diagnosed with any certain condition,

16      breathing condition, or anything?

17  A   No, I never really got into that.

18  Q   Okay.  Did you ever work with your dad?

19  A   No.

20  Q   Your mother's name?

21  A   Dorothy May.

22  Q   M-A-E or M-A-Y?

---

**34**

1   A   M-A-Y, I believe.

2   Q   Okay.  And how old was she when she passed?

3   A   Eighty-three or eighty-five.

4   Q   Okay.  Do you know what she passed away from?

5   A   Probably a heart attack.

6   Q   Okay.  If you don't know, just -- I mean, please let me

7       know.

8   A   Okay.  I am not for sure.

9   Q   That's fine.

10  A   Yeah.

11  Q   She was having heart issues, is that fair to say, heart

12      issues?

13  A   She fell and broke her hip, and the day she started

14      walking, she went to bed that night, and they found her

15      on her toilet the next morning.

16  Q   Okay.

17  A   So really that's all I know about it.

18  Q   That's fine.  Did your mom work?

19  A   No.

20  Q   Okay.  Did she work at all when you were a kid?

21  A   No.

22  Q   Okay.  Did your mom smoke?

---

**35**

1   A   Not that I remember.

2   Q   Okay.  Was your mom ever diagnosed with any forms of

3       cancer?

4   A   I don't believe so.

5   Q   Okay.  Any heart trouble, I mean other than --

6   A   Yes.

7   Q   Okay.  Any breathing problems that you know of?

8   A   No, sir.

9   Q   You say you have a sister?

10  A   Yes.

11  Q   Okay.  What's her name?

12  A   Vicki.

13  Q   V-I-C-K-I or V-I-C-K-Y.

14  A   K-I.

15  Q   And Vicki's last name?

16  A   Harris.

17  Q   Where does Vicki live?

18  A   I really don't know.

19  Q   Okay.  And Vicki is your only sister?

20  A   No.  I have another sister --

21  Q   Okay.

22  A   -- Linda.

---

**36**

1   Q   That's right.  And Linda's last name?

2   A   Blanchard.  Vero Beach.

3   Q   Another smart one.  Linda married?

4   A   No.

5   Q   Okay.  Is Linda a smoker?

6   A   Neither one of them.

7   Q   Okay.  They were never smokers?

8   A   (Witness shook head back and forth.)  I take that --

9       Linda used to smoke, but she quit quite awhile ago.

10  Q   Okay.

11  A   Sorry about that.

12  Q   No, that's all right.  Vicki ever diagnosed with any

13      forms of cancer, that you know of?

14  A   Not that I know of.

15  Q   Any breathing problems for Vicki?

16  A   No.

17  Q   Okay.  Linda ever been diagnosed with any forms of

18      cancer?

19  A   No.

20  Q   Any breathing problems that she has ever been diagnosed

21      with?

22  A   No, not that I am aware of.

---

Transcript of Robert Newkirk
Conducted on February 8, 2017

**37**

1  Q  Okay. Any other family members, other than your
2     father, work for the railroad?
3  A  **Grandpa.**
4  Q  Okay.
5  A  **My cousins.**
6  Q  All right. I assume your grandfather is deceased?
7  A  **Yes.**
8  Q  All right. Your cousins, their names?
9  A  **Dickersons. They are both retired.**
10 Q  Okay. Their first names?
11 A  **Jimmy.**
12 Q  Jimmy, and who else?
13 A  **Jimmy.**
14 Q  They are both Jimmy?
15 A  **Yeah.**
16 Q  All right. I assume they are not brothers?
17 A  **No. Yeah, father and son.**
18 Q  Okay. Did you ever work with either of them?
19 A  **No. They were in the car department.**
20 Q  Okay. Where did they work at?
21 A  **Grand Rapids.**
22 Q  Okay. Do you have any idea when Jimmy the father left

**38**

1     the railroad?
2  A  **No.**
3  Q  Okay. What about Jimmy the son?
4  A  **No.**
5  Q  Are both still living?
6  A  **As far as I know.**
7  Q  Okay. Any clue where they live?
8  A  **None.**
9  Q  Anybody else, any other family members work for the
10    railroad?
11 A  **Not that I am aware of.**
12 Q  Okay. Any relatives that you know that have been
13    diagnosed with cancer, other than what you have told
14    me?
15 A  **My sister's -- Linda's youngest boy died from cancer**
16    **related issues. I think he was about six.**
17 Q  Okay.
18 A  **That would have been in the '70s.**
19 Q  Anybody else?
20 A  **No.**
21    MR. HORVAT: Could we take like a two minute
22    break.

**39**

1     MR. PETRUCELLI: Sure.
2     (Discussion off the record.)
3  Q  (By Mr. Horvat) Did you graduate high school?
4  A  **(By the Witness) Kelloggsville.**
5  Q  You have to say yes. You graduated --
6  A  **Yes.**
7  Q  What was the name of the high school?
8  A  **Kelloggsville. K-E-L-L-O-G-G-S-V-I-L-L-E.**
9  Q  What year did you graduate?
10 A  **'75.**
11 Q  Any sort of post secondary education or anything like
12    that?
13 A  **Grand Rapids Junior College for a year-and-a-half.**
14 Q  Okay. And did you get college credits, were you
15    studying for something?
16 A  **I played football.**
17 Q  What position did you play?
18 A  **Tailback.**
19 Q  All right. Pretty fast back in your day?
20 A  **Yeah.**
21 Q  And then you left school to go on the railroad?
22 A  **Yes.**

**40**

1  Q  Okay. Any reason -- particular reason why you left
2     school?
3  A  **Wanted time to go to work.**
4  Q  Did you have a job while you were in high school?
5  A  **No, I didn't.**
6  Q  Okay. And I am pretty sure I know this answer, but you
7     didn't have a job while you were in school at Grand
8     Rapids Junior College, did you?
9  A  **No.**
10 Q  Okay.
11 A  **Not really, a bouncer at a bar.**
12 Q  Okay. Football was your job?
13 A  **Yeah.**
14 Q  Was the first job that you actually -- other than, you
15    know, being a bouncer, was the first job you actually
16    had on the railroad?
17 A  **Yeah. You could say that, yeah.**
18 Q  Maybe some other odd jobs you would do?
19 A  **No.**
20 Q  Okay. Were you ever in the military?
21 A  **No.**
22 Q  So you --

Transcript of Robert Newkirk
Conducted on February 8, 2017

**41**

1     MR. PETRUCELLI: It is kind of like being in
2 the military, working for the railroad. Excuse me.
3 Q  (By Mr. Horvat) So you first hired on in what,
4 November of '76, does that sound about right?
5 A  (By the Witness) Yeah.
6 Q  Okay. And where did you hire on at?
7 A  The diesel shop in Grand Rapids.
8 Q  Okay. What was your craft when you first hired on?
9 A  Laborer.
10 Q  How long were you a laborer at the Grand Rapids diesel
11 shop?
12 A  I believe right around a year.
13 Q  So from about '76 to '77?
14 A  Yeah.
15 Q  Okay. What was your duty as a laborer?
16 A  Clean the diesel shop, clean stuff, whatever I was told
17 to do —
18 Q  Okay.
19 A  — to help the mechanics and electricians out.
20 Q  Okay. How big was the shop?
21 A  Two pit, inside shop, hold maybe six engines.
22 Q  Did you work a certain shift?

**42**

1 A  Third.
2 Q  Okay. What time was that?
3 A  10:30 to 6:30.
4 Q  10:30 at night?
5 A  Yes. Sunday through Thursday.
6 Q  Okay. Was that the only place you worked at, I mean
7 building-wise, at Grand Rapids, the diesel shop, when
8 you were a laborer?
9 A  Well, when I hostled engines like in Elkhart, I worked
10 in their diesel shop. When I hostled engines in
11 Allentown, it was at the diesel shop, even though I was
12 an outside hostler.
13 Q  I guess what I am trying to ask you, was the diesel
14 shop the only building that you worked at in Grand
15 Rapids?
16 A  I might have to go to the car department and do
17 something, or something like that, once in a while.
18 Q  But most of your work would have been inside, in the
19 diesel shop?
20 A  In the diesel shop, yeah.
21 Q  How long was that diesel shop, lengthwise?
22 A  From D rail to D rail?

**43**

1 Q  From door to door.
2 A  Oh, door to door.
3 Q  From door -- or door to back wall.
4 A  Probably 200 feet.
5 Q  Okay.
6     MR. PETRUCELLI: Don't guess.
7     THE WITNESS: Okay.
8     MR. PETRUCELLI: Really, don't guess. If you
9 don't know, you don't know.
10     THE WITNESS: I don't know.
11 Q  (By Mr. Horvat) Okay. Try to give you -- Longer than
12 a football field?
13 A  (By the Witness) No. No.
14 Q  I assume there was large doors?
15 A  Yeah, four of them.
16 Q  Okay. Were there doors on both sides --
17 A  Yes.
18 Q  -- to come in and then come out?
19 A  Yeah.
20 Q  On both ends, excuse me.
21 A  On both ends, on both pits.
22 Q  And you hired on -- When you hired on in November of

**44**

1 '76, you hired with Conrail; correct?
2 A  Yes.
3 Q  Are Conrail and NS the only two railroads you worked
4 for?
5 A  Correct. Excuse me.
6 Q  Yeah.
7 A  I did put a little bit in for the Kent, Barry, Eaton
8 Railway.
9 Q  That's okay.
10 A  I'm sorry.
11 Q  Thank you for reminding me, I was going to ask you
12 about that. Were there -- At the Grand Rapids diesel
13 shop, okay, were there windows in the shop, if you
14 recall?
15 A  Not that I recall.
16 Q  Okay. Were there any sort of exhaust fans or anything
17 like that on the roof or inside of the shop that you
18 recall?
19 A  Not that I recall.
20 Q  Okay. And you may have mentioned this before, you said
21 it could hold six engines, that shop?
22 A  Yeah.

Transcript of Robert Newkirk
Conducted on February 8, 2017

---

**45**

1  Q  Okay. Your 10:30 to 6:30 shift, how many people would
2      approximately be working there?
3  A  **Maybe eight.**
4  Q  Okay.
5  A  **That's a guess.**
6  Q  Okay. Less than 20 people would be working?
7  A  **No doubt.**
8  Q  Okay. What would they be doing, let me ask you --
9      Strike that. What other crafts were working?
10 A  **Electricians, machinists, and people that did the**
11     **running work for outside.**
12 Q  When you say "running work for outside," what do you
13     mean by that?
14 A  **Like when engines would come in to be serviced, on the**
15     **outside service track, fuel, sand, brake shoes, any**
16     **problems, electrical or whatever, they could do right**
17     **there.**
18 Q  Okay. And as a laborer, you are just kind of running,
19     getting a tool, or helping any of these guys out; is
20     that correct?
21 A  **Yeah.**
22 Q  Okay. Did you have a supervisor on duty during that

---

**46**

1      shift?
2  A  **Yes.**
3  Q  Do you recall his name?
4  A  **Dave Pixler.**
5  Q  With a P?
6  A  **I believe so.**
7  Q  Okay. P-I-X-L-E-R, does that sound about right?
8  A  **Sounds about right.**
9  Q  Okay. Do you have any idea if Dave is still alive?
10 A  **Not a clue.**
11 Q  All right. That one year you were a laborer at Grand
12     Rapids, the diesel shop, do you believe you were
13     exposed to diesel fumes during that one year?
14 A  **Oh, yeah.**
15 Q  How so?
16 A  **Just from working on them and having them there.**
17 Q  Okay.
18 A  **Having them around.**
19 Q  Whenever they were brought into the shop, okay, were
20     they running whenever they were brought into the shop?
21 A  **Some were, some weren't.**
22 Q  Okay. Would they run inside of the shop?

---

**47**

1  A  **Yeah, some of them did, yeah.**
2  Q  Okay. Is that how you would have been exposed to
3      diesel fumes, whenever they were running inside of the
4      shop?
5  A  **Yeah, or if I was working on them outside on the pit.**
6  Q  Outside of the shop?
7  A  **Yeah, on the running track or whatever.**
8  Q  Okay.
9  A  **Putting them away, yeah.**
10 Q  Okay. Whenever you were working inside of the shops,
11     are the engines -- the engines are running, I believe
12     you said?
13 A  **Sometimes.**
14 Q  Sometimes, okay. Why would they be running?
15 A  **Well, if they had road power or something that needed**
16     the brakes tooken (sic) up, it was a bad -- Back then,
17     we used to get a lot of snow in Grand Rapids, and
18     instead of working on them on the pit, they would bring
19     them inside, getting road power ready.
20 Q  Okay.
21 A  **It was just easier to work on them, work for the guys.**
22 Q  Would they be brought in -- obviously, sometimes they

---

**48**

1      are running whenever they are brought in?
2  A  **Yeah.**
3  Q  And then shut down?
4  A  **They could be, yeah, or they would be left running to**
5      **fix what they needed to be fixed, to go out to get on**
6      **the train.**
7  Q  How often would that happen, when they were left
8      running?
9  A  **I am not sure.**
10 Q  Okay. How long would they be in there, left running,
11     if you can recall?
12 A  **I don't recall.**
13 Q  Are you talking hours, minutes?
14 A  **I can't say.**
15 Q  Okay. Are the doors kept open in that shop? Were they
16     kept open in that shop? Excuse me.
17 A  **They could be, sometimes they very well could be, yeah.**
18 Q  Okay. Were they kept open in the summer?
19 A  **Yes.**
20 Q  Okay.
21 A  **A lot of times they were.**
22 Q  Were they kept open in the winters?

---

Transcript of Robert Newkirk
Conducted on February 8, 2017

**49**

1  A  Not really.
2  Q  Okay.
3  A  Not that I can recall anyways.  It got cold.
4  Q  Whenever you were working outside -- You said you were
5     working outside in the pit.  You are physically outside
6     of a building; is that correct?
7  A  Yes.
8  Q  Okay.  What are you doing, when you are outside working
9     on the engines, or helping work on the engines?
10 A  I might be cleaning the windows, sweeping out the cabs,
11    helping somebody that needed a hand.
12 Q  Okay.  What part of your job -- If you can quantify it,
13    great.  If you can't, let me know.  What part of your
14    job -- what percentage of your job as a hostler at
15    Grand Rapids was inside versus outside?
16 A  As a hostler?
17 Q  Yeah, that one year, whenever you were a laborer over
18    there at Grand Rapids.
19 A  Oh, I really couldn't say.
20 Q  Okay.  Could you say one was more than the other?
21 A  No.
22 Q  Okay.  Do you have some sort of lunch break or anything

**50**

1     like that, whenever you worked that shift?
2  A  Yes.
3  Q  Okay.  Where would you take your lunch?
4  A  There.
5  Q  In the shop?
6  A  In the lunchroom.
7  Q  Okay.  There was a lunchroom inside of the shop?
8  A  Yeah.
9  Q  It was a separate room?
10 A  Yeah.
11 Q  How long was your lunch?
12 A  I think 20 minutes, half an hour, something like that.
13    Could be longer if you had all of your work done till
14    the next deal.
15 Q  All right.  What was your next job after you worked
16    there -- worked at Grand Rapids as a laborer?
17 A  I went firing out of Jackson, Michigan, on Amtrak.
18 Q  You worked for Amtrak?
19 A  No.
20 Q  Okay.
21 A  That was before Amtrak went Amtrak.
22 Q  Okay.  So you worked --

**51**

1  A  You know what I mean.
2  Q  You were working passenger lines?
3  A  Yeah.
4  Q  But you worked for Conrail?
5  A  Yes, the Michigan line.
6  Q  What was your job or craft?
7  A  Fireman.
8  Q  Okay.  How long were you a fireman at Jackson?
9  A  Till I got set up as an engineer --
10 Q  Okay.
11 A  -- or sent to school as an engineer.
12 Q  Do you remember when that was?
13 A  I believe -- I believe I went to school in -- I believe
14    '79, and when you pass your promotion, they gave you a
15    seniority date as your hire-out date as a fireman, so
16    my fireman date was my engineer date of '77.
17 Q  Okay.  Makes sense.  If you could describe for me what
18    a fireman does?
19 A  Help the engineer.
20        MR. PETRUCELLI:  What a fireman did?
21        THE WITNESS:  What the fireman did.
22        MR. HORVAT:  Yeah, that's true.

**52**

1        THE WITNESS:  What a fireman did, help the
2  engineer.
3        MR. PETRUCELLI:  They don't have fireman any
4  more, do they?
5        MR. HORVAT:  No.
6        MR. PETRUCELLI:  They did.
7  Q  (By Mr. Horvat)  What else did you do as a fireman,
8     other than help the engineer?
9  A  (By the Witness)  That was it.
10 Q  Okay.
11 A  That was enough.
12 Q  So you were there for about two years, as a fireman at
13    Jackson?
14 A  Yeah.
15 Q  Were you working in the yard, or were you over the
16    road?
17 A  Well, sometimes I -- I fired some freight, too, like
18    the east end pool, or whatever.  It just -- wherever
19    your seniority would go.  Sometimes I would have to go
20    back to Grand Rapids for a little bit, sometimes back
21    to Jackson.  A lot of it depended on vacations.
22 Q  Sure.  I know you were low man on the totem pole at

Transcript of Robert Newkirk
Conducted on February 8, 2017

---

**53**

1    that point in time?

2  A  Yeah.

3  Q  So sometimes you would go back to Grand Rapids and work

4    in the yard?

5  A  Yeah.

6  Q  I assume you were making up trains and things like

7    that?

8  A  Yeah.

9  Q  And you worked in the Jackson yard?

10  A  Yeah.

11  Q  Making up trains, as well?

12  A  Yeah. Or taking a train Jackson to Detroit or -- as a

13    fireman, learning the route.

14  Q  What runs did you make over that two-year period that

15    you recall?

16  A  Jackson to Detroit, Jackson to Elkhart, freight-wise.

17  Q  Yeah. You did passenger, as well?

18  A  Jackson to Niles, Niles to Detroit.

19  Q  That would have been passenger?

20  A  Yes.

21  Q  Did you work more passenger than freight when you

22    were -- over this two-year period, if you can quantify

---

**54**

1    it, if you can recall?

2  A  I can't. I can't even guess -- give you a good guess.

3  Q  Okay. Did you make -- Were you on the road more than

4    working in the yards?

5  A  Yeah.

6  Q  Okay.

7  A  Yes.

8  Q  And when I say "on the road," I am meaning freight and

9    passenger, is that fair?

10  A  Correct. Yep.

11  Q  Okay. Any way you can quantify road versus yard work?

12  A  No.

13  Q  Okay. But you said you worked more road work than yard

14    work, is that fair?

15  A  Yeah.

16  Q  Okay. Are you doing all right, sir?

17  A  Yeah.

18  Q  Okay. LP doing all right?

19    During that two-year period, whenever you

20    were a fireman, do you believe you would have been

21    exposed to diesel fumes?

22  A  Um-h'm. Yes.

---

**55**

1  Q  Okay. How so?

2  A  On freight and yard, just from the other engines

3    working in the yard, and the exhaust that was in the

4    yard, and then on the freight trains when I was firing,

5    because of the holes in the cabs and stuff.

6  Q  What about when you were running passenger, do you

7    believe you would have been exposed to diesel fumes?

8  A  Yeah, but not as much.

9  Q  Okay. How so as on the passenger lines?

10  A  Well, on the Michigan lines, we had them turboliners

11    that come over from France.

12  Q  Do you know who manufactured those?

13  A  No, I don't, but they were jet engines with direct

14    drive.

15  Q  Whenever you were up there in the yard, you say you

16    have been exposed to diesel fumes in the yard over that

17    time period?

18  A  Right.

19  Q  I assume, is that the Jackson and same for Grand

20    Rapids?

21  A  Yeah, anywhere.

22  Q  And are you out -- physically outside of a building

---

**56**

1    whenever you are talking about that time?

2  A  Yeah.

3  Q  Do you know who manufactured the freight trains you were

4    discussing?

5  A  Electric EMDs, General Motors and General Electrics.

6    And when I first hired out there, they still had some

7    ALCos, but they got rid of them, so mostly General

8    Motors and GE, General Electric.

9  Q  Okay. Were the fumes worse on one than the other?

10  A  Not that I can remember.

11  Q  Okay. Do you recall the names of any of your engineers

12    that you worked with over that two-year period?

13  A  Yeah.

14  Q  Okay.

15  A  Jay Sharon, Fernald, J.B. Frizell, Larry Richardson,

16    Clyde Hathaway, Phillips. I can't think of -- Earl,

17    Earl Phillips (phonetic spellings).

18  Q  Okay. Do you still talk to any of these guys?

19  A  No.

20  Q  Do you know if any of them are still alive?

21  A  Probably not.

22  Q  Okay. You talked about it briefly, but how would you

---

Transcript of Robert Newkirk
Conducted on February 8, 2017

---

**57**

1   have been exposed to diesel fumes when you were riding
2   on the freight trains as a fireman?
3   **A   Just the exhaust, coming up in the cab from the cab**
4   **floors or the cabinets.**
5   Q   Okay.
6   **A   Can I grab a coffee?**
7   Q   Oh, absolutely.
8       (Discussion off the record.)
9   Q   (By Mr. Horvat)  All right.  You talked about the cab
10  floors and the cabinets.  Okay.  Whenever you were
11  riding freight during that two-year period, are you
12  riding long hood or short hood forward?
13  **A   (By the Witness)  Mostly it was short hood forward,**
14  **except on the locals.  Then one way you are going short**
15  **hood, and the next you are going long hood.**
16  Q   Okay.  Go ahead.
17  **A   And on the locals, they were usually GP7s and GP9s.**
18  Q   Those are the older ones?
19  **A   Yeah.**
20  Q   Where is the exhaust stack on the short hood forward?
21  **A   Behind you.**
22  Q   Okay.  Silly question, then long hood, is it in front

---

**58**

1   of you?
2   **A   (Witness nodded head.)**
3       THE REPORTER:  I am sorry.  Would you answer
4   verbally, please?
5       MR. HORVAT:  I am sorry.
6       THE WITNESS:  Oh, I am sorry.
7       MR. HORVAT:  I will ask it again.
8   Q   (By Mr. Horvat)  The long hood, the stack is in front
9   of you?
10  **A   (By the Witness)  Yes.**
11  Q   I told you at some point in time we will probably
12  become conversational.
13      Did you run more locals than freights?
14  **A   Not in that two-year period.**
15  Q   Okay.
16  **A   But later on, yes.**
17  Q   If you are running short hood, how would the exhaust
18  come in through the cab floors?
19  **A   I don't know.  You know, I don't -- I don't -- you**
20  **know, it wasn't vacuum cabs.**
21  Q   Okay.
22  **A   They had holes in the floors, holes in the car bodies**

---

**59**

1   actually back then.
2   Q   Okay.  Could you see the exhaust coming in?
3   **A   No.**
4   Q   Okay.  Could you smell it?
5   **A   Yeah.**
6   Q   Okay.  During that two-year period, did you ever report
7   to your supervisor or the engineer the diesel exhaust
8   problem?
9   **A   Yes.**
10  Q   Okay.  Did you ever fill out a grievance?
11  **A   No.**
12  Q   Who did you report it to?
13  **A   Engineer, and then he would tell the yardmaster or**
14  **trainmaster, whatever, if he felt that.**
15  Q   Okay.  Could you have filled out a grievance form as a
16  fireman?
17  **A   I don't know.  I never -- I never did as a fireman.**
18  Q   Okay.  So your next job in the '80s, where did you go
19  work?
20  **A   Allentown.**
21  Q   Okay.  So 1980 I guess we are up to.  You go to
22  Allentown?

---

**60**

1   **A   That's right around that time, yeah.  You know, I am**
2   **not --**
3   Q   Well, at some point in time, you went to work for
4   General Motors and for Kent, Barry?
5   **A   Yes.**
6   Q   When did you go to work for General Motors?
7   **A   When I come back from Allentown.**
8   Q   Okay.
9   **A   Because they furloughed me within 30 days after moving**
10  **back.**
11  Q   So you are working Allentown for about a year, is that
12  about right --
13  **A   Yeah.**
14  Q   -- what you said?
15  **A   Within a year, yeah.**
16  Q   Do you get transferred there, or did you put in for a
17  transfer, or how did that work?  Did you --
18  **A   They sent me a letter asking me if I wanted to go.**
19  Q   Okay.  And what craft are you when you are working in
20  Allentown?
21  **A   Engineer.**
22  Q   Okay.  Is it the Allentown yard you are working out of?

---

Transcript of Robert Newkirk
Conducted on February 8, 2017

**61**

1  A  Yes. Diesel shop, because I was an outside hostler.
2  Q  What does an outside hostler do?
3  A  Runs power to anywhere that need it, tie on the train
4     in the yard, pump air, bring a set of power to
5     somewhere else for another train, or just do outside
6     the house hostling.
7  Q  Okay. Making up trains, moving trains around?
8  A  No. Just the power.
9  Q  Okay.
10 A  You were stationed — Allentown had a big diesel shop,
11    the old style, the round —
12 Q  Turntable?
13 A  Yeah. The — It would hold like three, six axle units,
14    and they had the old style outhouse. And you were in
15    the trailer, and when they needed you, they called you,
16    and that's when you went to work.
17 Q  So you are pulling engines in and out, moving them?
18 A  That was the inside hostler's job.
19 Q  Okay.
20 A  They had like two or three inside hostlers and two or
21    three outside hostlers. They had engines up the butt.
22 Q  So this may seem like a silly question, but as an

**62**

1     outside hostler, you are working outside; is that
2     correct?
3  A  Outside of the diesel shop.
4  Q  Yeah.
5  A  When you took your engine — you are going outside —
6     yeah.
7  Q  Did you make any runs out of Allentown?
8  A  Outside hostler.
9  Q  Okay. Did you take them any industries or anything
10    like that, or just working in the yard?
11 A  Yeah, wherever they needed their power.
12 Q  Okay. And would you have worked around or been exposed
13    to diesel fumes when you did that job —
14 A  Yeah.
15 Q  — at Allentown?
16 A  Yeah.
17 Q  Okay. That's from working around the engines —
18 A  Yeah.
19 Q  — outside?
20 A  Yeah. I mean, excuse me. It was a big pit. They had
21    two pits with — I don't know how long they were.
22 Q  Okay.

**63**

1  A  But they had sand and fuel. The pits were big.
2  Q  But you are physically working outside, like in the
3     elements and —
4  A  Yeah. I mean, all the engines on the pits are running.
5     The ones in the shop might be down, or pulled outside
6     of the shop, or running, so there was a lot of exhaust
7     hanging in Allentown, Pennsylvania.
8  Q  So you worked there for about a year, got transferred
9     back to Detroit — or went back to Michigan, excuse me?
10 A  Michigan, yeah, District A.
11 Q  And you got furloughed?
12 A  Yeah. That's when I went to work for General Motors.
13 Q  Was that the first time you were furloughed?
14 A  I believe so.
15 Q  Okay.
16 A  Well, no, it was the second, because that's when I got
17    the letter, the first time they furloughed me.
18 Q  Well, how long were you furloughed the first time?
19 A  Not very long. When I got that letter, I went.
20 Q  Was it for more than two weeks, that first time?
21 A  Yeah. I really couldn't guess. It has been so long
22    ago.

**64**

1  Q  That's all right. Like I said, I am going to be asking
2     you questions to cause you to reach back so —
3  A  I don't have an answer for you on that.
4  Q  And you went to General Motors for about four years?
5  A  Yeah.
6  Q  Okay. From about '81 to '85?
7  A  Yeah, sounds in the ballpark.
8  Q  Okay. That's the only place you have worked over that
9     four-year period?
10 A  Yeah, except I don't know the KB&E —
11 Q  Yeah.
12 A  — date, I'm sorry.
13 Q  That's okay. We will talk about that in a second.
14    What General Motors plant did you work at?
15 A  Number 1 stamping plant, and I also worked on one,
16    Burlingame and Burton, which was the diesel in that
17    period.
18 Q  Burlingame?
19 A  And Burton.
20 Q  Burton, where is that located?
21 A  Burlingame and Burton.
22 Q  All right.

Transcript of Robert Newkirk

Conducted on February 8, 2017

65

1  A  That's — Back then it was called diesel — GM Diesel.

2  Q  Okay.

3  A  I believe.

4  Q  Where is the No. 1 stamping plant?

5  A  It used to be at 36th Street.

6  Q  And?

7  A  Buchanan.

8  Q  Okay.

9  A  But it is gone.

10 Q  What did you do whenever you worked at the 36th Street

11    and Buchanan?

12 A  Stock chaser.

13 Q  Okay.  What does a stock chaser do?

14 A  Pick up — Put parts on a conveyor so a welder can make

15    something out of it.

16 Q  Correct me if I am wrong, so, you know, you get Part A

17    to the welder, and the welder welds it onto the car.

18    Is that how it works?

19 A  Well, they are making a front door.

20 Q  Yeah.

21 A  Okay.  They've got this part.  You supply this part.

22    It goes down the line, and maybe three — three over,

66

1     you give them another part, just keep the front door

2     line stocked with parts, so at the different places

3     they did it, they had the parts to keep it going.

4  Q  Okay.  Would you have been exposed to welding fumes

5     whenever you worked there?

6  A  They had fans —

7  Q  Okay.

8  A  — and exhaust, but who knows.  I mean, very well could

9     have — I mean, it is a big plant.  And it was just the

10    weld that they come down and (indicating) hit the

11    button.

12       MR. PETRUCELLI: Spot welding.

13       THE WITNESS: Spot welding, yeah, that's it.

14       MR. PETRUCELLI: Sorry.

15       MR. HORVAT: No, that's okay.

16       THE WITNESS: It wasn't like somebody taking

17    a thing and welding like --

18       MR. PETRUCELLI: Seam welding.

19       THE WITNESS: Yeah.  Yeah, spot welding,

20    exactly.

21 Q  (By Mr. Horvat)  Was the plant dirty, dusty?

22 A  (By the Witness)  No, not — no.

67

1        MR. PETRUCELLI: Off the record.

2        (Discussion off the record.)

3  Q  (By Mr. Horvat)  How long did you work at the

4     36th Street plant?

5  A  (By the Witness)  I am not really sure.  Longer than I

6     did at the other one.

7  Q  Okay.

8  A  How is that?

9  Q  That's fine.  That's fine.  So did you do anything

10    else, other than stock chaser at that plant?

11 A  No, not really.  That was — I did drive a towmotor for

12    a while, but not very long.  I'd rather stock chase.

13 Q  What kind of cars were they building?

14 A  The bigger — the bigger ones, the bigger front doors,

15    the hoods, and stuff like that.

16 Q  Okay.  Would they paint them there, as well?

17 A  No, just stamping.

18 Q  Okay.  When you went over to the Burton plant, what was

19    your job?

20 A  I ran a machine that ground lifters, put a groove in a

21    lifter, so when it went down, it came back with oil, to

22    keep it oiled.

68

1  Q  Okay.  You called it the GM Diesel.  Why was it called

2     the GM Diesel?

3  A  Because they made engine parts.

4  Q  Okay.  I assume that was a large plant, as well?

5  A  Yeah.

6  Q  Would you have been exposed to any fumes, or anything

7     like that at that plant, that you know of?

8  A  No, that was a real clean plant.

9  Q  Did you work there about four years for GM, about that

10    time?

11 A  No.  I spent longer in the 36th Street stamping.

12 Q  I'm sorry, altogether for GM you worked for about four

13    years?

14 A  Yes.

15 Q  And then you worked for the Kent, Barry switching?

16 A  It might have been before that, I did.

17 Q  Okay.

18 A  But it wasn't -- I didn't work at that Kent, Barry that

19    long before it went under.

20 Q  What did you do for the Kent, Barry?

21 A  Anything and everything.

22 Q  Okay.

Transcript of Robert Newkirk
Conducted on February 8, 2017

69

1  A   Ran the engine, did track inspection, all kinds of
2      stuff. It was a -- I don't know how to say it.
3  Q   It was a minority-owned railroad?
4  A   Yeah.
5  Q   It only -- Was it operating for like a year or so?
6  A   I'm not really sure.
7  Q   Okay. How long did you work there?
8  A   Not quite a year.
9  Q   Okay. How many engines did they have?
10 A   One.
11 Q   Did you make any runs or anything like that, or just
12     yard work?
13 A   They would go to like Hastings, something like that,
14     yeah. Did I do that? Yeah. A couple of times, yeah.
15     It wasn't an everyday thing.
16 Q   Okay. How did you find that job?
17 A   I had a friend that worked there.
18 Q   Okay. What is his name?
19 A   Frank Lewis.
20 Q   Is Mr. Lewis still alive?
21 A   Yes, as far as I know, he is.
22 Q   Do you know where Mr. Lewis lives?

70

1  A   No, I don't.
2  Q   Okay.
3  A   The last I knew -- Well, he worked at Steelcase.
4  Q   That's the furniture place?
5  A   Yes, sir.
6  Q   Ran engines, track inspection, anything else you recall
7      doing there?
8  A   No.
9  Q   What was -- Do you remember the name of the individual
10     that owned it, the railroad?
11 A   No, I don't.
12 Q   Who was your boss there, do you know?
13 A   Frank.
14 Q   Okay. Would you have been exposed to diesel fumes when
15     you worked there?
16 A   Yeah. It was a diesel engine. It was just a pup.
17 Q   Do you know who manufactured that engine?
18 A   General Motors, I believe.
19 Q   Would you have been exposed riding on the engine?
20 A   Yeah. If I -- Yeah. Their engineer, his name was
21     Robert Janek.
22 Q   J-A-N-E-K?

71

1  A   Yeah. So like if he had a day off and they needed
2      something done, I could run the engine for them because
3      I was --
4  Q   Okay.
5  A   -- a promoted engineer.
6  Q   Okay.
7  A   But my job wasn't to run the engine there. It was in
8      the track department --
9  Q   Okay.
10 A   -- the two-guy track department.
11 Q   Got your exercise?
12 A   Huh?
13 Q   Got your exercise there?
14 A   Yeah, two-man gang.
15 Q   The way you described being exposed to diesel fumes
16     while riding on the freight trains with Conrail, would
17     you have been exposed the same way when you worked at
18     Kent, Barry --
19 A   Yeah.
20 Q   -- in the yard, and then riding on them, as well?
21 A   They didn't have a yard.
22 Q   Okay. But same way riding on them?

72

1  A   Yeah.
2  Q   Okay. Were you ever injured while working for the
3      Kent, Barry?
4  A   Yep.
5  Q   Okay. What kind of injury did you have on the Kent,
6      Barry?
7  A   I tore my left -- I can't think of the name they call
8      it, your knee.
9  Q   ACL?
10 A   'No.
11 Q   MCL?
12 A   No.
13 Q   Meniscus?
14 A   Yeah. Yeah.
15 Q   Were you off work for a period of time?
16 A   Yeah.
17 Q   How long?
18 A   I am not really sure. After that happened, I think
19     they kind of went down.
20 Q   Okay. You put them under?
21 A   Yeah.
22 Q   And when did you go back to Conrail?

Transcript of Robert Newkirk
Conducted on February 8, 2017

---

73

1  A  I am not really sure. It was General Motors, after
2     working at GM.
3  Q  Okay. All right. Do you recall when you went back to
4     Conrail after you worked for GM?
5  A  No, I don't know the date or —
6  Q  Okay. Was it in the '80s still?
7  A  Yes, I believe so.
8  Q  Okay. Well, do you recall what job you went back to or
9     where you were working at?
10 A  There was a time there that they had reserve engineers,
11    and I don't know if it was then or if I went back to
12    Grand Rapids first, because it was considered an
13    outlying point, and people that were furloughed could
14    bid on outpost jobs, so I am not really sure.
15 Q  Okay.
16 A  If that makes sense to you.
17 Q  Where is the next yard you recall working at, whenever
18    you come back from General Motors?
19 A  It would have been Elkhart.
20 Q  That was your home yard?
21 A  Yeah.
22 Q  Okay. And you were working as an engineer?

74

1  A  Reserve engineer.
2  Q  Reserve engineer, okay. Do you recall how long you
3     worked in Elkhart?
4  A  No, I do not.
5  Q  Okay. More than five years?
6  A  No.
7  Q  Okay.
8  A  But I might have come back before that and worked in
9     Grand Rapids as an engineer, on an outpost job, because
10    I could bid them. If it went no bid, they would let me
11    work them. So I am not sure on the —
12 Q  That's fine.
13 A  That's being honest.
14 Q  No, like I said, I truly understand that it is a long
15    time ago.
16 A  Yeah.
17    (Discussion off the record.)
18 Q  (By Mr. Horvat) Do you recall any of the runs you made
19    from Elkhart?
20 A  (By the Witness) Elkhart to Cleveland, Elkhart to
21    Wayne, Elkhart to Lansing, Elkhart to Chicago, that's
22    it.

---

75

1  Q  Okay. How many days a week were you working as an
2     engineer there at Elkhart?
3  A  Probably every day, sometimes double. If I was a
4     reserve engineer, in that time frame, I went to work
5     when they called me.
6  Q  Okay. You didn't have a regular job, you were reserve,
7     so you were working off the extra board?
8  A  No. The reserve — They set up the reserve engineer
9     board so people wouldn't leave and go to a different
10    railroad. So they paid you a guarantee to sit home,
11    and one day they would call you and say, hey, would you
12    go to Cleveland to take — yeah, you know, it was
13    basically to keep people on the railroad. They didn't
14    wand to spend the money sending you to engineer school
15    for you to go hire out on the Burlington Northern.
16 Q  Sure.
17 A  I can't remember the time frame, but basically that's
18    what that was.
19 Q  Okay. Do you remember where you worked after Elkhart?
20 A  Grand Rapids, I believe.
21 Q  That was the next yard you would have worked out of, I
22    guess would have been your home yard, I guess?

76

1  A  Yeah.
2  Q  How long was that?
3  A  I am not sure.
4  Q  Okay.
5  A  I mean it is all blended in.
6  Q  Yeah. No, I understand.
7  A  I — I will wait.
8  Q  Do you recall working out of Toledo?
9  A  Yeah.
10 Q  When did you work out of Toledo?
11 A  I got —
12 Q  Go ahead.
13 A  I left Grand Rapids, and I went to work out of Bryan,
14    Ohio. From Bryan, Ohio, I went to Toledo.
15 Q  Okay.
16 A  And I worked Toledo to Elkhart, and then I worked
17    Toledo to Chicago.
18 Q  Are these all with Conrail, or at some point in time
19    you went with NS?
20 A  Yes. Well, there was some time, I think it was 1999 it
21    went to NS. That's NS.
22 Q  Do you recall what yard you were working out of when it

---

Transcript of Robert Newkirk
Conducted on February 8, 2017

---

Page 77

1  turned to NS?
2  A  Bryan, Ohio. That's a fact.
3  Q  All right.
4  A  I will never forget the day.
5  Q  Why do you say that?
6  A  Because they wanted to fire me. No. The Spangler
7  Candy Company is a big business in Bryan, Ohio. And
8  the conductor I was working with threw the switch, and
9  give me a go-ahead, and I went ahead. And he didn't
10  lock the switch down, so the engine went on the ground,
11  and the switch went through the fuel tank, and all of
12  the fuel ran out in the Spangler Candy Company.
13      And the NS was like, the engineer didn't ask
14  for a double-check. The guy on -- The union man goes,
15  well, we go by Conrail rules and double-check ain't in
16  our rule book. He didn't do nothing wrong. We want
17  him fired. Well, you can't fire him. So that's how
18  that happened.
19  Q  All right.
20  A  First day of the takeover.
21  Q  June 1st?
22  A  Yeah. I will never forget that day. And the kid was

Page 78

1  crying, the conductor. You will laugh about this one
2  day, Tommy, you really will. They are going to fire
3  me. No, they won't, they want to fire me.
4  Q  The runs you described earlier, like Toledo to Chicago,
5  Bryan to Chicago, Bryan to Elkhart, did any runs change
6  over that time period from -- you know, from the time
7  you were working at Grand Rapids until the time you
8  retired?
9  A  What now?
10  Q  That's a terrible question.
11  A  You lost me.
12  Q  I lost myself. Whenever your home yard was Grand
13  Rapids, whenever you were an engineer, what runs did
14  you make?
15  A  Grand Rapids to Elkhart.
16  Q  Okay.
17  A  Elkhart to Grand Rapids, and I used to work the local
18  out of Grand Rapids, the Plainwell Otsego.
19  Q  Okay.
20  A  And I worked a lot of work trains out of Grand Rapids.
21  Q  Okay. Whenever you were working or you were making the
22  runs to -- Grand Rapids to Elkhart, Elkhart to Grand

Page 79

1  Rapids, are you running long hood or short hood
2  forward?
3  A  Short hood. They were road units on the road jobs, and
4  on the local, you ran them short hood down, long hood
5  back, or vice versa, however.
6  Q  Okay.
7  A  You know.
8  Q  Is it fair to say you ran more short hood than long
9  hood whenever you were working out of Grand Rapids?
10  A  No, because back when they got rid of the Jeeps, then
11  you -- then you -- I don't know how to explain it.
12  When you worked out of Grand Rapids into Elkhart, you
13  ran short hood lead, but when you went to work out of
14  Elkhart, you ran short hood back. But if you had the
15  locals, long or short, whatever, it just -- it just
16  depended on which way it was facing that day, if you
17  worked short hood down or long hood down.
18  Q  Okay, okay.
19  A  If that makes any sense to you.
20  Q  Would there be less diesel fumes running short hood
21  than long hood forward? Is that fair?
22  A  About the same.

Page 80

1  Q  You would still be exposed to the same amount of fumes
2  running short hood --
3  A  Yeah.
4  Q  -- than running -- as running long hood, excuse me?
5  A  Yeah. Well, you've got more in the cab from the
6  windows and stuff running long hood lead.
7  Q  Would you ride with the windows open in the summer?
8  A  Yeah.
9  Q  Okay. Would you -- Would the windows be closed in the
10  winter?
11  A  Yeah. You might have to crack them, though, to keep
12  the moisture down.
13  Q  Okay. Would fumes come in the open windows?
14  A  I imagine so. You couldn't see them, you know, if they
15  were coming up through the floor or through the
16  cabinets. You used to get a lot of air coming through
17  the cabinets.
18  Q  You couldn't see the fumes, but you could smell them?
19  A  Yeah.
20  Q  Okay. And you couldn't tell if they were coming
21  through the floor, or the cabinets, or through the
22  windows?

Transcript of Robert Newkirk
Conducted on February 8, 2017

---

81

1   A   Right.
2   Q   Do you recall what runs you made with NS?
3   A   Yeah. I worked out of Bryan, Ohio.
4   Q   Okay.
5   A   I usually went west, to Ligonier, and Ligonier back to
6       Bryan, when I worked out of Bryan. When I worked out
7       of Toledo, Toledo to Elkhart, and then Toledo to
8       Chicago.
9   Q   Okay. And whenever you retired, you were working out
10      of Toledo; is that correct?
11  A   Yes. I was in Toledo to Chicago long pool when I
12      retired.
13  Q   Okay. Did you have a regular run that you had when you
14      worked out of Bryan?
15  A   Yeah. I can't remember the symbol of it.
16  Q   Was that Bryan to Ligonier?
17  A   Yeah.
18  Q   And whenever you worked out of Toledo, did you have a
19      regular run?
20  A   In the short pool, no. In the long pool, they did put
21      a preferred pool in for a little bit, and I did work a
22      preferred job for a little while, and they take them

82

1       off, put them on, take them off.
2   Q   Okay. Are you still running locals out of Bryan and
3       Toledo?
4   A   Are they still?
5   Q   No. Were you still running locals out of Bryan and
6       Toledo, or were you just over the road, or --
7   A   Out of Bryan, that's where I worked the local out of.
8   Q   Okay.
9   A   Toledo, I worked Toledo to Elkhart, which was road,
10      Toledo to Chicago, which was road.
11  Q   You were running short hood forward on those road
12      jobs --
13  A   Yes.
14  Q   -- Toledo to Elkhart, and Toledo to Chicago?
15  A   Yes.
16  Q   What about local at Bryan?
17  A   If you had two engines, they were usually bi, so you
18      worked short hood both ways. If you only had one unit
19      you worked down short, long back, or vice versa.
20  Q   Okay. Other than the furlough, whenever you worked for
21      GM and the Kent, Barry, did you ever have any other
22      furloughs after that?

83

1   A   No.
2   Q   Okay. You worked continuously pretty much until the
3       time you retired?
4   A   Yeah. Yes. I catch myself once in a while.
5   Q   Whenever NS took over in '99, did any of your duties as
6       an engineer change?
7   A   No, I don't believe so.
8   Q   Did any rules change whenever NS took over in '99, that
9       you know of?
10  A   No. They still went by Conrail rules on the day of the
11      takeover.
12  Q   What about in the years afterwards that you worked for
13      NS, did any of the rules change, that you know of?
14  A   When I was there, I believe it was still by Conrail's
15      rules, but they did start implementing some of NS
16      stuff.
17  Q   For example, like what?
18  A   Double-check, so if a guy threw a switch, you had to
19      ask him double-check. And if you didn't and something
20      happened, then you got fired because you didn't ask him
21      if he double-checked it.
22  Q   Were you working any yard jobs in Bryan when you worked

84

1       with NS?
2   A   No.
3   Q   Okay.
4   A   They had all locals out of there.
5   Q   Okay.
6   A   They had I think four or five locals that worked out of
7       Bryan.
8   Q   Okay. And Toledo, you were just running --
9   A   Freight.
10  Q   -- freight road jobs, okay. You receive an RRB
11      pension?
12  A   Disability.
13  Q   Approximately how much do you receive a month?
14  A   Right around 3,000.
15  Q   Is that your only source of income?
16  A   Yes.
17  Q   You don't have any rental properties or anything like
18      that?
19  A   No.
20  Q   Okay. Whenever you come up here with Mr. Barwiller,
21      how long do you usually stay?
22          MR. PETRUCELLI: That's kind of new. I mean,

Transcript of Robert Newkirk                    22 (85 to 88)
Conducted on February 8, 2017

---

85

1    it just started in December of 2016, Counsel, so I'm
2    not sure -- I mean, we have a two-month window here,
3    so --
4    Q   (By Mr. Horvat)  Is this the first time you have done
5        it?
6    A   (By the Witness)  Yeah.
7            MR. PETRUCELLI:  Number one, Osseo is a long
8    ways from here.
9            MR. HORVAT:  Okay.
10           THE WITNESS:  It is 15 miles from Bryan,
11   Ohio.  It is like between Bryan, Ohio, and Hillsdale,
12   Michigan, right off --
13           MR. PETRUCELLI:  It is 500 miles from here.
14   So I am just trying to help you out.
15           MR. HORVAT:  I appreciate it.  That's fine.
16           MR. PETRUCELLI:  It is all new, is it not,
17   this new living arrangement?
18           THE WITNESS:  Yeah.  Yeah.  I knew John's
19   dad, and I know John.
20           MR. PETRUCELLI:  Okay.  I am just trying to
21   help him cut -- because he didn't have that information
22   in the answers to interrogatories.

---

86

1            THE WITNESS:  Okay.
2            MR. PETRUCELLI:  So you are trying to -- you
3    kind of changed the picture here of your lifestyle, and
4    he is trying to find out what your lifestyle is, which
5    he is entitled to find out.  I just want to help both
6    of you get on the same page here.
7            MR. HORVAT:  Okay.
8            THE WITNESS:  Okay.
9    Q   (By Mr. Horvat)  Do you have any plans to live anywhere
10       else, like in the summer, or in the winter, or anything
11       like that?
12   A   (By the Witness)  I hope to, yeah.
13   Q   Okay.
14   A   Yeah.
15   Q   Any certain location or anything like that?
16   A   Where I can breathe and do things better.
17   Q   Okay.  Where can you breathe and do things better?
18       What type of weather, I guess?
19   A   Where it is not like this (indicating), or humid in
20       like Florida, hot and humid.  I went down to visit my
21       daughter a couple of weeks ago, and it was 85 and
22       muggy.  And it is like -- oh, it just tears me up, just

---

87

1        like --
2    Q   The cold does?
3    A   -- this does now.  It is --
4    Q   Okay.
5    A   It is hard on me.
6    Q   Okay.  You haven't worked since you left the railroad?
7    A   No.
8    Q   Okay.  In your answers to interrogatories, you named a
9        bunch -- five co-workers.  John Fortice (phonetic
10       spelling), is that who -- if I pronounce his name
11       correctly?
12   A   Yes.
13   Q   What did John do for the railroad?
14   A   He is an engineer.
15   Q   Does he still working for the railroad?
16   A   I believe so.
17   Q   Okay.  He lives in Michigan?
18   A   Yes.
19   Q   Okay.  When is the last time you talked with John?
20   A   A couple years ago.
21   Q   Okay.  Do you know where John works out of?
22   A   I believe Toledo.  I could be wrong.  I haven't spoke

---

88

1    to him in quite a while.
2    Q   That's fine, the best of your knowledge.  Did you ever
3        make any runs with John?
4    A   Yeah, because he -- I have worked with him in Bryan
5        before.
6    Q   Okay.
7    A   He hired out as a conductor, and then he got promoted
8        to an engineer.
9    Q   So you ran the local jobs out of Bryan with
10       Mr. Fortice?
11   A   Maybe once or twice.  It wasn't regular or anything
12       like that.  In fact, I might not have ever worked with
13       him.
14   Q   Mr. Tom Salzer (phonetic spelling)?
15   A   Tom Salzer, a Jackson man.
16   Q   Okay.
17   A   Engineer.  And I never worked with Tom neither.
18   Q   So you never made any runs with Tom?
19   A   No.
20   Q   When is the last time you spoke with Tom?
21   A   Been years.
22   Q   And Tom you believe lives in Jackson?

---

Transcript of Robert Newkirk
Conducted on February 8, 2017

23 (89 to 92)

89

1  A   He worked out of Jackson. He was a Jackson man. I am
2      not sure where he lives.
3  Q   All right. Mr. Bonny, Rudy Bonny?
4  A   Jackson man.
5  Q   What railroad were you working for whenever you worked
6      with Tom?
7  A   I never worked with Tom.
8  Q   Okay. Well --
9  A   He used to -- Tom used to be an old crew dispatcher.
10 Q   Okay.
11 A   That's where he come out in the engine service room,
12     and he was a crew dispatcher out of Jackson.
13 Q   Were you guys both working for Conrail whenever you
14     worked at the same location?
15 A   Yeah. He worked -- Yeah.
16 Q   How about NS?
17 A   No.
18 Q   What about Rudy, he is Jackson, you said?
19 A   Yeah.
20 Q   So you would have been working at -- with Conrail,
21     excuse me?
22 A   Yes.

90

1  Q   And what did Rudy do again?
2  A   Engineer.
3  Q   Did you ever make any runs with Rudy?
4  A   No.
5  Q   Tim Galloway?
6  A   Tom.
7  Q   Tim -- Tom?
8  A   It is Tom, excuse me. Toledo man, Toledo west man,
9      engineer. And no, I never worked with him.
10 Q   Okay. NS, or Conrail, or both?
11 A   I think he is an NYC man.
12 Q   But you never worked for New York Central?
13 A   No. I might be wrong, but I think --
14 Q   Well, did he work -- whenever he is working out of
15     Toledo, were you guys working with NS together?
16 A   I didn't -- I never -- We were in the same pool --
17 Q   Yeah.
18 A   -- if that's what you mean by work.
19 Q   You were employed by NS?
20 A   You're right.
21 Q   Okay.
22 A   Yeah.

91

1  Q   Did you ever work -- when I say "together," I am not
2      meaning on the same run or anything like that.
3  A   Okay. We worked the same pool, Toledo to Chicago pool.
4  Q   Okay. And Dick Messenger?
5  A   Elkhart, Indiana, conductor, yard man.
6  Q   Okay. You guys would have been with Conrail; is that
7      correct?
8  A   Yes.
9  Q   Okay.
10 A   And I did work with Dick before in the yard.
11 Q   Okay. What would you and Dick have done together?
12 A   He was a conductor and I was an engineer.
13 Q   You never made any runs with Dick, just yard work?
14 A   No. He was a yard man.
15 Q   Okay. When is the last time you spoke with Dick?
16 A   Probably a month ago. I keep -- Dick is a good friend
17     of mine.
18 Q   Okay. Dick lives in Mishawaka?
19 A   Yes.
20 Q   The only reason I know that is it is right by
21     Notre Dame.
22 A   However, he did just build a house in Crab Orchard,

92

1      Tennessee.
2  Q   When is the last time you spoke with Rudy?
3  A   It has been years.
4  Q   Okay. Same deal with Tom, it has been years?
5  A   Yes.
6  Q   Okay. Tom Salzer, that is.
7  A   Right.
8  Q   Same with Tom Galloway, it has been years?
9  A   Yeah. The only one I have talked to recently is Dick
10     Messenger.
11 Q   Okay. Okay. Do you recall the names of any of your
12     supervisors when you worked with NS?
13 A   No.
14 Q   What about with Conrail?
15 A   Yeah.
16 Q   Okay.
17 A   Butch Hayden. Is that what you are asking me?
18 Q   Yeah, any of the names of your supervisors that you
19     recall.
20 A   Rick Cavalier, Bar -- I can't think of his -- he was
21     out of Bryan, and that's about it.
22 Q   Okay. Bar is his name?

Transcript of Robert Newkirk
Conducted on February 8, 2017

---

93

1  A  Bar.
2  Q  B-A-R?
3  A  Yeah.  He was a trainmaster in Bryan.
4  Q  Okay.  Did you ever file any sort of formal complaint
5     with Butch about diesel fumes or being exposed to
6     diesel fumes?
7  A  No.
8  Q  Did you ever file a formal complaint with Mr. Cavalier
9     regarding diesel fumes or anything like that?
10 A  No.  No.
11 Q  What about Mr. Bar, ever file a formal complaint with
12    him regarding diesel fumes?
13 A  I don't believe so.
14 Q  Okay.  Whenever you worked with Conrail, did you ever
15    have a respirator or mask or anything like that?
16 A  No.
17 Q  Did you ever see anyone else wearing any sort of
18    respiratory protection or respirator when you ever
19    worked with Conrail?
20 A  I can't say I did.
21 Q  Okay.  Did you ever ask for one whenever you worked for
22    Conrail?

94

1  A  No.
2  Q  Okay.  Whenever you worked with NS, did you wear a
3     respirator or mask or anything like that?
4  A  (Witness shook head back and forth.)
5  Q  Did you ever see anyone else wear one when you worked
6     for NS?
7  A  No.
8  Q  Did you ever ask for one when you worked at NS?
9  A  No.
10 Q  Conrail, did you have safety meetings?
11 A  I am sure we did.  You know, I am not — I don't recall
12    them, but —
13 Q  Okay.  Do you recall how often they were held, if they
14    had them?
15 A  No.
16 Q  Okay.  Do you recall the rule of the day?
17 A  Yeah.  I seem to think, when you sign in, there was
18    something on the sign-in sheet about the rule of the
19    day —
20 Q  Okay.
21 A  — if I remember correctly, but I could be wrong.
22 Q  Okay.  Did you have safety meetings with NS?

95

1  A  Yeah.
2  Q  Okay.  How often?
3  A  Every few months, I think they — I am not really sure.
4  Q  Okay.
5  A  They would give you a trinket or whatever.
6  Q  For completing the class?
7  A  Or — Yeah, a meeting.
8  Q  Okay.  Do you recall any of the specifics of any of the
9     meetings?
10 A  No, I don't.
11 Q  How about did you have a safety manual or safety book
12    whenever you worked for Conrail?
13 A  Um-h'm.  (Witness nodded head.)
14 Q  Did you have one with NS?
15 A  I believe they did.
16 Q  Okay.  Did you ever have any safety tests at Conrail,
17    test you on your safety knowledge?
18 A  I — Well, I had people ride with me before, if that's
19    what you mean.
20 Q  Did you have like taking a test, like on a piece of
21    paper --
22 A  Oh.

96

1  Q  -- with Conrail?
2  A  Like the book of rules, I am not sure if they did it.
3     I don't remember, I don't recall.
4  Q  What about with NS?
5  A  I don't recall.
6  Q  You are obviously a member of a -- I don't know, what
7     unions were you a member of?
8  A  BLE.
9  Q  Any other?
10 A  Yeah.  When I was a laborer, fireman and oilers.
11 Q  Okay.  Do you remember your local number with the BLE?
12 A  My first one?  I do, 2.
13 Q  Number 2?
14 A  Yep.
15 Q  All right.
16 A  But then after that, I have changed, and this and that,
17    from going to different places.  I don't remember
18    Toledo's.  I don't remember Elkhart's, but I do
19    remember Division 2 where I hired out at —
20 Q  Okay.
21 A  — just because of the two.
22 Q  You know, I assume you don't remember your fireman and

---

Transcript of Robert Newkirk
Conducted on February 8, 2017

---

**97**

1     oilers local number?

2  A  No, I don't have a clue.

3  Q  Did you ever go to union meetings?

4  A  No. I mean, I have been to a couple of BLE meetings,

5     but never a fireman and oilers meeting.

6  Q  Did you ever have any sort of leadership role with the

7     BLE?

8  A  No.

9  Q  Okay. Never local chairman or anything like that?

10  A  No.

11  Q  Okay. Did they send out union magazines or

12     publications, newspapers, or anything at the BLE?

13  A  Yeah, yeah.

14  Q  Okay. Did they ever discuss diesel fumes or anything

15     like that, that you recall?

16  A  Not that I recall.

17  Q  Okay. Did you ever make any complaints regarding

18     diesel fumes to your local chairman or anything like

19     that?

20  A  Yeah.

21  Q  Okay. Who was your local chairman?

22  A  Davie Fernald.

**98**

1  Q  Could you spell Mr. Fernald's last name?

2  A  Good luck. Sorry.

3  Q  That's okay.

4  A  I can't help you there. If I had my phone with me, I

5     could look it up, but I don't.

6  Q  Okay. When is the last time you spoke with Davie?

7  A  Well, it has been a while ago.

8  Q  More than a few years?

9  A  Probably -- No. I bet you it is six, seven months ago.

10  Q  Is he still working, Davie?

11  A  No, he is retired.

12  Q  Okay. What did he do for the railroad?

13  A  Engineer.

14  Q  Okay. You complained about diesel fumes to Davie?

15  A  Yeah.

16  Q  Did you fill out any form or anything like that?

17  A  No.

18  Q  Just --

19  A  Just --

20  Q  -- talking?

21  A  Just bitched, just bitched.

22  Q  All right. Are you doing all right, sir?

---

**99**

1  A  Yeah.

2  Q  Okay.

3       MR. PETRUCELLI: We should ask, are you doing

4     all right, Patrick?

5       MR. HORVAT: I am hanging in there.

6       MR. PETRUCELLI: It kind of goes both ways.

7  Q  (By Mr. Horvat) Did you ever have to go through any

8     tunnels on any of your runs, that you recall?

9  A  (By the Witness) No.

10  Q  Before you go out on the road, did you have to do an

11     inspection of the locomotive or the engine -- Let me

12     start -- let me just stop and break it up a little bit.

13     Whenever you were with Conrail, before you take an

14     engine out on the road, did you have to do an

15     inspection of the engine?

16  A  If the cab cards weren't signed, yes.

17  Q  What about with NS, did you have to do an inspection?

18  A  Check the cab cards. If the cab cards were out of

19     date, yes.

20  Q  Did you have to do an ME-60?

21  A  Work report?

22  Q  Yeah.

**100**

1  A  Yeah.

2  Q  Okay. Did you have to do that every time before you

3     took one out?

4  A  No. It was usually at the end of the trip if they were

5     supplied, they were on the engines. Sometimes they

6     didn't have them there.

7  Q  Okay. So there was a folder inside of the cab that

8     would hold the ME-60 card; is that right?

9  A  If they were there, yeah.

10  Q  Okay. And what would go into an ME-60 inspection that

11     you recall?

12  A  Well, if you were getting like a Toledo to Chicago

13     train, it was right on the main line.

14  Q  Okay. Did you ever have to perform an ME-60

15     inspection, you yourself?

16  A  You mean a 24-hour inspection?

17  Q  Yeah.

18  A  Yeah.

19  Q  Okay.

20  A  Yeah.

21  Q  How often would you have to do that?

22  A  Whenever the cab cards weren't out of date, and

---

Transcript of Robert Newkirk

Conducted on February 8, 2017

---

101

1    basically that would be at an outpost assignment like
2    Bryan, or something like that.
3  Q    Okay.
4  A    Because at Bryan, I think they used to take -- if you
5       don't mind, they used to take their engines to Elkhart
6       like maybe once a week to get serviced, so after
7       24 hours, you had to make the inspection. Does that
8       make sense?
9  Q    Yeah.
10 A    Okay.
11 Q    What goes into the inspection itself?
12 A    Brakes shoes, sanders, water, oil, stuff like the
13       federal government requires to be done.
14 Q    The FRA requires?
15 A    Yeah.
16 Q    Did you have to do ground inspection, engine room
17       inspection?
18 A    Yeah.
19 Q    Brake check, truck check?
20 A    Yeah.
21 Q    Springs, pins?
22 A    Wheels.

---

102

1  Q    Wheels, traction motors?
2  A    (Witness nodded head.)
3  Q    That's part of the ground inspection?
4  A    Yeah. It is kind of hard to see traction motors and
5       stuff.
6  Q    As far as an engine room inspection, as part of that,
7       walkways, check the oil, water leaks, you know, air
8       brakes, radios, things like that?
9  A    (Witness nodded head.)
10 Q    Is that correct?
11 A    Correct. Hand brake, yeah.
12 Q    Were any of the engines that you worked on air
13       conditioned whenever you worked with Conrail?
14 A    Some of them. The newer ones they started getting in
15       toward the end, yes.
16 Q    What about with NS?
17 A    Yes.
18 Q    Were they all --
19 A    The road units.
20 Q    The road units were air conditioned?
21 A    They were starting to come out with the -- I don't know
22       what they -- dash nines, or I guess that style of

---

103

1    bodies.
2  Q    Whenever you worked with NS, were they just the road
3       engines that were air conditioned?
4  A    Yes.
5  Q    Were there more air conditioned than non-air
6       conditioned, whenever you worked with NS, the road
7       engines?
8  A    Yeah. Yeah.
9  Q    Okay.
10 A    Except on the locals, they were all the junkers.
11 Q    What?
12 A    Most of the -- Now, most of the Toledo to Chicago pool
13       engines were good engines.
14 Q    Okay.
15 A    The short pool -- the short pool, Toledo to Chicago,
16       like you would get junk coming out of Bellevue, Ohio,
17       the NS yard, so it was fricking junk.
18 Q    Okay. What about Conrail, did they have air
19       conditioned engines on the road?
20 A    Some.
21 Q    Did NS or Conrail have a dead heading policy?
22 A    I wasn't very familiar with NS's.

---

104

1  Q    Okay.
2  A    Conrail, they usually would dead head on Amtrak, but I
3       believe on NS, a lot of times you would stop and pick
4       people up on your train, put them on your train, and
5       bring them in to Toledo, or whatever.
6  Q    Would they take vans and stuff like that, as well, and
7       trucks?
8  A    Conrail would.
9  Q    Okay.
10 A    And Amtrak -- Like I say, Conrail used to dead head a
11       lot of people on Mondays, down to Chicago.
12 Q    Okay.
13 A    And I -- I never once got picked up on Conrail, on a
14       dead train and brought in to somewhere --
15 Q    Okay.
16 A    -- like the NS did.
17 Q    Okay.
18 A    You know, that never happened.
19 Q    Okay.
20 A    That's all I can say. I don't know what NS dead
21       heading policy was.
22 Q    Okay. Did NS or Conrail have any shutdown or idling

---

Transcript of Robert Newkirk
Conducted on February 8, 2017

105

1     programs or policies?
2  A  What now?
3  Q  Shutdown or idling programs of the engines, that you
4     know of?
5  A  Well, they got them engines now when you -- when they
6     are in idle, they shut down automatically.  Is that
7     what you are talking about?  I didn't --
8  Q  Was that in service whenever you were there?
9  A  They just started coming out with them things.
10 Q  Okay.
11 A  When you would put them in forward, they would start,
12     yeah.
13 Q  Okay.
14 A  I didn't work with many of them.
15 Q  Okay.
16 A  But I have seen them.
17 Q  How about electric locomotives, and yard serviced?
18 A  I never had electric units.
19 Q  Okay.
20 A  And they would be out east.
21 Q  All right.
22       MR. HORVAT: Let's take five minutes, real

106

1     quick, if that's all right.
2       (Discussion off the record.)
3  Q  (By Mr. Horvat)  What -- Are you on any medications
4     right now?
5  A  (Witness hands Mr. Horvat a document.)
6  Q  All right.  We will probably just make this an exhibit.
7  A  I couldn't pronounce them, so I wrote them.
8  Q  Very good.
9       MR. PETRUCELLI:  You could make it an
10    exhibit.
11      MR. HORVAT:  Yeah, I am going to make an
12    exhibit, but I want to ask him a couple of questions.
13    I will mark this as Exhibit A.
14      (Exhibit A marked for identification.)
15 Q  (By Mr. Horvat)  Okay.  Mr. Newkirk has handed me a
16    handwritten note.  I assume it is your handwriting,
17    sir?
18 A  (By the Witness)  Yes.
19 Q  With the list of his medications you are currently on;
20    is that correct?
21 A  Yes.
22 Q  Prednisone five milligrams, it says 2X, I assume that's

107

1     twice a day?
2  A  Yes.
3  Q  What's your prednisone for?
4  A  For my condition.
5  Q  Is that the COPD?
6  A  Yeah.  Diesel asthma, whatever.
7  Q  Okay.  Who prescribes the prednisone for you?
8  A  They are all prescribed by Dr. Knitter.
9  A  All of these drugs listed on this piece of paper are
10    prescribed by Dr. Knitter?
11 A  Correct.
12      THE REPORTER:  Can you spell his name,
13    please?
14      MR. PETRUCELLI:  Is it K-N-I-T-T-E-R?
15      THE WITNESS:  Yeah.
16      MR. HORVAT:  Correct.
17 Q  (By Mr. Horvat)  And Singulair?
18 A  (By the Witness)  I do take the generic for that.
19 Q  That's okay.
20 A  But it is that long (indicating).
21 Q  That's perfectly fine.  And you take that once a day?
22 A  Um-h'm.  (Witness nodded head.)

108

1  Q  That's also for your COPD?
2  A  Yeah.
3  Q  And Stiolto Respimat?
4  A  Yes.
5  Q  Is that an inhaler?
6  A  Yes, two puffs once a day.
7  Q  Do you take that in the morning, or at any point in
8     time during the day, or when do you take that?
9  A  I try to wait until the afternoon, except today I did
10    it before I came in here.
11 Q  Okay.  Of course, there is a hard one, ipratropium
12    bromide?
13 A  Yeah.  That is a solution --
14 Q  Okay.
15 A  -- for the nebulizer machine.
16 Q  Okay.  How often do you use the nebulizer?
17 A  Whenever I am not feeling well.  I use it more -- like
18    when I got up here, I started using it again.  I take
19    it with me wherever I go.
20 Q  Do you use it as-needed, is that fair to say?
21 A  Yes, up to four times a day.
22 Q  Okay.  But the prednisone you take every day,

Transcript of Robert Newkirk
Conducted on February 8, 2017

109

```
1    regardless?
2  A  Yes.
3  Q  And the Singulair, same deal, take it every day?
4  A  Yes.  The other one, too, the Respimat.  The other ones
5     as-needed.
6  Q  Okay.
7  A  And the Albuterol is a rescue inhaler, as-needed.
8  Q  Okay.  So the bromide and the nebulizer you use
9     as-needed; is that correct?
10 A  Yes.  Yes.
11 Q  And along with the Albuterol inhaler, you use that
12    as-needed, as well?
13 A  Right.
14 Q  Okay.  Do you take anything else?
15 A  No.
16 Q  Okay.  You said all of these are prescribed by
17    Dr. Knitter?
18 A  Correct.
19 Q  Okay.  And he is your pulmonologist?
20 A  Yes, sir.
21 Q  Okay.  And your family doctor is Dr. Weeks?
22 A  Yes.
```

110

```
1  Q  How long have you been treating with Dr. Weeks?
2  A  Since I moved up to Grayling, 2011.
3  Q  Okay.  He is at Grayling Family Practice?
4  A  Correct.
5  Q  We will talk about your current condition, your COPD,
6     in a moment.  But what types of things has Dr. Weeks
7     treated you for, other than your COPD?
8  A  Shoulder.
9  Q  Okay.
10 A  That's -- When I first started seeing him, I had a
11    cough.
12 Q  Okay.
13 A  And --
14 Q  That's in 2011?
15 A  Yeah.  Actually, the first few times I seen him it was
16    because of a cough, and he diagnosed it as acute
17    bronchitis.
18 Q  Okay.  Anything else, other than the cough and the COPD
19    and the shoulder, that Dr. Weeks has treated you for,
20    that you can recall?
21 A  No.
22 Q  Okay.
```

111

```
1  A  Other than, you know, checkups and physicals and things
2     like that.
3  Q  Okay.  You may not know this answer, how long have you
4     been on prednisone?
5  A  A few years.
6  Q  Okay.
7  A  Same with all of them.
8  Q  When you say "a few years," is that more than three?
9  A  Well, yeah, quite a few years.
10 Q  Okay.
11 A  How is that?
12 Q  More than five?
13 A  No.
14 Q  More than three, though?
15 A  Some of them maybe.
16 Q  Okay.  Unfortunately, I have to ask you which ones.  Do
17    you know if you have been on prednisone for more than
18    three years?
19 A  No, I don't.
20 Q  Do you know if you have been on --
21 A  Excuse me.
22 Q  Go ahead.  No, no.
```

112

```
1  A  I am going to help you out.
2  Q  Short circuit?
3  A  Yeah.  The nebulizer, I have been on longer than three
4     years.
5  Q  Okay.
6  A  That's the only one I am sure of and the rescue
7     inhaler.
8  Q  The Albuterol?
9  A  Yeah.
10 Q  These are both for your COPD; is that correct?
11 A  (Witness nodded head.)
12       MR. PETRUCELLI:  You have to answer.
13 Q  (By Mr. Horvat)  Yes?
14 A  (By the Witness)  Yes.  I'm sorry.
15 Q  I apologize.  Caught me before -- I appreciate that.
16    Who was your family doctor before Dr. Weeks, if you had
17    one?
18 A  I don't remember.
19 Q  Okay.  Did you have one?
20 A  Yes.
21 Q  Okay.  Do you know where he or she was located?
22 A  Grand Rapids.
```

Transcript of Robert Newkirk
Conducted on February 8, 2017

---

**113**

1 Q Okay.

2 A Or --

3 Q Dr. Lewis?

4 A Yeah.

5 Q That was him?

6 A Yeah. That was my family doctor, yeah, for a long,

7 long time, long time.

8 Q All right. What types of things did Dr. Lewis treat

9 you for?

10 A Everything, everything.

11 Q Anything specifically that you recall him treating you

12 for, other than, you know --

13 A Just --

14 Q -- common colds --

15 A -- basic kid stuff.

16 Q -- the flu, you know?

17 A Yeah.

18 Q Antibiotics, things like that; is that correct?

19 A Yeah, stitches.

20 Q Dr. Richard Bereza -- Bereza, what type of doctor is

21 he?

22 A A surgeon for knees.

---

**114**

1 Q Okay. Did he work on your meniscus?

2 A Yeah.

3 Q Okay. Is that the only thing he did for you pretty

4 much?

5 A I believe so, correct.

6 Q Dr. Thomas Ohagan?

7 A Shoulder.

8 Q He is an orthopaedic doctor?

9 A Yes.

10 Q Other than your shoulder, did Dr. Ohagan treat you for

11 anything else?

12 A No, sir.

13 Q Dr. Ohagan never treated you for your COPD?

14 A No, sir.

15 Q Dr. Bereza never treated you for your COPD; is that

16 correct?

17 A (Witness shook head back and forth.)

18 Q Is that correct?

19 A Correct. I'm sorry, correct.

20 Q That's all right. Dr. Neuman?

21 A Correct.

22 Q What type of doctor is Dr. Neuman?

---

**115**

1 A I don't know his official title, but it was for my

2 neck.

3 Q Okay. He -- Dr. Neuman never treated you for your

4 COPD; is that correct?

5 A No. No.

6 Q That is correct?

7 A That is correct, he never has.

8 Q Okay. Did Dr. Lewis ever treat you for your COPD?

9 A No.

10 Q Okay. Have you ever had to stay overnight in a

11 hospital for your COPD?

12 A No.

13 Q Have you ever -- other than I assume you spent time in

14 the hospital for the explosion; is that correct?

15 A Yeah, when -- yeah.

16 Q And probably for your surgery for your knee?

17 A Yeah.

18 Q Okay. Any other times that you had had any overnight

19 hospital stays, that you recall?

20 A When they did my shoulder, when Ohagan did my shoulder,

21 it was outpatient. I had hernia surgery, tonsils, knee

22 replacement. So that's about it.

---

**116**

1 Q Okay. Dr. McClellan?

2 A Yes.

3 Q He is an allergy doctor, ENT?

4 A Allergy doctor.

5 Q Okay. What types of things has Dr. McClellan treated

6 you for?

7 A I can't think of what you would call it, say if you

8 were allergic to things, and he did a breathing thing

9 on me.

10 Q PFT?

11 A I am not sure.

12 Q Okay. Did he ever give you a nebulizer, Dr. McClellan?

13 A Yes.

14 Q When did you first start seeing Dr. McClellan, if you

15 know?

16 A I seen him two times, and the best of my recollection,

17 it was April of 2013.

18 Q Okay. Those are the only two times you saw him that

19 you recall?

20 A Yes, sir.

21 Q Do you have any plans to go back to see Dr. McClellan

22 at this time?

Transcript of Robert Newkirk
Conducted on February 8, 2017

117

1  A  No, none.
2  Q  Okay.  Now, whenever you saw him in 2013, was he
3     treating you for your COPD, or was it for allergies, if
4     you know?
5  A  That's when I was taking down the fireplace, and I
6     thought there must -- there might have been something
7     in the air, because I -- shortness of breath and stuff
8     like that.  So I went to see him, he checked me for
9     allergies; allergic to dust mites.  That's where taking
10    out the carpet come in at.
11 Q  Okay.
12 A  And that's that.
13 Q  Okay.  He was trying to see if you had some sort of
14    allergy, or something like that?
15 A  Right.
16 Q  Okay.
17 A  Yeah.  I thought there might be something in the air.
18 Q  Okay.  When did you first start having shortness of
19    breath or breathing issues, I guess?
20 A  I believe it was -- like I first complained to
21    Dr. Weeks about it, and I don't know if it was in the
22    second -- the first, second, or third time I seen him,

118

1     when he diagnosed me with acute bronchitis.
2  Q  Okay.
3  A  And it was either 2011 or 2013.  I really can't get the
4     grip on the exact date.
5  Q  Okay.  Could you possibly have been diagnosed or told
6     you had COPD as far back as 2009?
7  A  No.
8  Q  Okay.  If I show you a medical record that says COPD,
9     would that help refresh your recollection?
10 A  Yeah.            ^
11 Q  Okay.  I will give you a copy.  We will mark it as B.
12       (Exhibit B marked for identification.)
13 Q  (By Mr. Horvat)  Do you recall being treated at the
14    Reynolds Clinic?
15 A  (By the Witness)  Yes, I do -- I do -- went there.
16    That was after the explosion.
17 Q  Okay.
18 A  I believe.
19       MR. PETRUCELLI:  Can you just --
20    parenthetically, where is that at?
21       THE WITNESS:  Toledo, Ohio.
22 Q  (By Mr. Horvat)  Do you recall who you would have

119

1     treated with at the Reynolds Clinic?
2  A  (By the Witness)  No, I don't.
3  Q  Okay.  But you don't recall being diagnosed with COPD
4     in 2009?
5  A  No, I don't.
6  Q  Okay.  Did Dr. Weeks ever diagnose you with COPD?
7  A  Yes.
8  Q  Okay.
9  A  I don't remember the year or the date --
10 Q  Okay, that's fine.
11 A  -- neither.
12 Q  That's fine.  Tell me -- Explain to me how you came to
13    get the diagnosis of COPD, from what you recall,
14    Dr. Weeks?
15 A  Well, I had a cough --
16 Q  Okay.
17 A  -- and shortness of breath --
18 Q  Okay.
19 A  -- like I have never had before, and that's how.
20 Q  Okay.  Now, when you say like you have never had it
21    before, had you had shortness of breath prior to that
22    instance?

120

1  A  Not that I recall.
2  Q  Okay.  The first time you recall having shortness of
3     breath was --
4  A  Right.
5  Q  -- whenever you saw Dr. Weeks, in whatever, 2011 or
6     2013; correct?
7  A  Right, correct.
8  Q  Okay.  The first time you saw him -- I will show you
9     this.  I will mark this as C.  It is a record from
10    Dr. Weeks', from his Grayling practice.
11       (Exhibit C marked for identification.)
12 Q  (By Mr. Horvat)  Does that sound about right, October
13    of 2011?
14 A  (By the Witness)  Yeah.
15 Q  Okay.
16 A  That sounds about right.
17 Q  That's when you started having your shortness of breath
18    and your coughing?
19       MR. PETRUCELLI:  Wait a minute, that's not
20    what it says in the record, and that's not what he
21    says.
22       MR. HORVAT:  Okay.

Transcript of Robert Newkirk
Conducted on February 8, 2017

---

**121**

1     MR. PETRUCELLI: The record speaks for
2  itself.
3     MR. HORVAT: Okay. The record says the
4  patient has been coughing for two weeks. Is that --
5     MR. PETRUCELLI: That's what it says. If
6  that's what it says, that's what it says. I don't see
7  shortness of breath in there, so there is no
8  foundation, at least in that record, to say that, and
9  he hasn't made a foundation on that.
10     MR. HORVAT: Okay.
11 Q  (By Mr. Horvat) Do you know what dyspnea with
12  ambulation means?
13 A  **(By the Witness)** No, I don't.
14 Q  Would you have told him that you had been coughing for
15  two weeks, Dr. Weeks?
16 A  **Would I have -- What do you mean?**
17 Q  You went to see Dr. Weeks in 2011; right?
18 A  **Right.**
19 Q  Okay.
20 A  **Yeah.**
21 Q  You went to -- because you had a cough; is that
22  correct?

---

**122**

1 A  **Yeah. It wasn't -- Yeah.**
2 Q  Okay. And you also told him, sometime in 2011, you
3  were having shortness of breath; is that correct?
4 A  **Right.**
5 Q  Okay. And you went to see him because something was
6  wrong with you, you thought?
7 A  **Right.**
8 Q  Is that correct?
9 A  **Right.**
10 Q  Okay. Did he prescribe anything -- anything to you at
11  that time?
12 A  **I don't recall.**
13 Q  Okay.
14 A  **He very well might have.**
15 Q  Okay. Did he diagnose you with COPD in 2011,
16  Dr. Weeks, if you recall?
17 A  **No.**
18 Q  How long before -- I assume Dr. Weeks referred you to
19  Dr. Knitter; right?
20 A  **No.**
21 Q  Okay. How did you come about to treat with
22  Dr. Knitter?

---

**123**

1 A  **After McLaren (sic), the guy with the -- that did the**
2  **testing for --**
3 Q  Oh, okay --
4 A  **-- to see if I was allergic to something.**
5 Q  -- the allergies.
6 A  **I talked to a lady, and she said, Bob, you ought to go**
7  **see a pulmonary specialist.**
8 Q  Okay.
9 A  **That's how I got in to Dr. Knitter.**
10 Q  Okay. And the first time you would have saw him is
11  what, 2013?
12 A  **'13, yes.**
13     MR. PETRUCELLI: Who, Knitter?
14     MR. HORVAT: Dr. Knitter, yeah.
15     MR. PETRUCELLI: June of 2013, if you want to
16  be precise.
17     MR. HORVAT: Okay.
18 Q  (By Mr. Horvat) Dr. McClellan referred you to
19  Dr. Knitter?
20 A  **(By the Witness)** No.
21 Q  Okay. Oh, someone -- Excuse me, forgive me, strike
22  that.

---

**124**

1 A  **I was talking to a lady that worked in the health**
2  **field, and she said, Bob, you ought to go talk to a**
3  **pulmonary specialist.**
4 Q  Okay.
5 A  **So I got on the computer, and I looked up pulmonary**
6  **specialists in northern Michigan.**
7 Q  Okay. And that's how you got --
8 A  **Yeah. I seen where he was from, I seen where he went**
9  **to school at and where he practices stuff at, and**
10  **that's how I picked him to go see him.**
11 Q  Okay. What was that woman's name that you talked to?
12 A  **Boy, I can't even -- I can't even remember.**
13 Q  Okay.
14 A  **It was just somebody that I ran into at a gas station,**
15  **that had a medical uniform on, that I said, hey, will**
16  **you look at this.**
17 Q  What did you show her?
18 A  **The pulmonary test thing.**
19 Q  Okay. Is that the one you had at Dr. McClellan's
20  office?
21 A  **Yes.**
22     MR. PETRUCELLI: You mean Dr. McLean,

---

Transcript of Robert Newkirk
Conducted on February 8, 2017

---

125

1 Dr. McLean, is it not?

2     MR. HORVAT: I have McClellan here, at

3 Bayside Allergy.

4     MR. PETRUCELLI: Bayside Allergy?

5     MR. HORVAT: Yeah.

6     THE WITNESS: Yeah, that thing.

7     MR. HORVAT: So it would have been -- I will

8 show it to Mr. Petrucelli.

9     MR. PETRUCELLI: That's all right.

10     MR. HORVAT: Okay. We will mark this as D.

11     (Exhibit D marked for identification.)

12     MR. PETRUCELLI: These aren't -- I don't know

13 what these records are being used for because he didn't

14 create them. If you are trying to refresh his

15 recollection, I am not sure that's appropriate, a, and,

16 b, he didn't write any of these records, but go ahead

17 and use them for whatever you want, but I may impose an

18 objection.

19     MR. HORVAT: That's fine, that's fine. Okay.

20 So --

21     THE WITNESS: When I seen this --

22     MR. PETRUCELLI: Wait a minute. Let him ask

---

126

1 the question.

2     THE WITNESS: Okay.

3 Q  (By Mr. Horvat) All right. So when you went to

4 Dr. McClellan because you were having the shortness of

5 breath and the --

6 A  (By the Witness) Right.

7 Q  -- issues, he did a spirometry on you; is that correct?

8 A  Correct. Yeah. I don't know what it is called.

9 Q  At the Bayside Allergy --

10     MR. PETRUCELLI: Let him finish his question.

11 Q  (By Mr. Horvat) I will help you along here. So he

12 performed a spirometry at Bayside Allergy; right?

13 A  (By the Witness) Yeah.

14 Q  And that's when you found out you were having breathing

15 issues; is that correct?

16 A  Correct.

17 Q  And then after you had this test done --

18 A  Right.

19 Q  -- which I have marked as Exhibit D, this spirometry

20 report --

21 A  Correct.

22 Q  -- that's dated April 14th, 2013 --

---

127

1 A  Correct.

2 Q  -- you saw the woman at the gas station?

3 A  Right.

4 Q  Okay. And you showed her this report?

5 A  Right.

6 Q  Okay. And then she said you should go see a pulmonary

7 doctor?

8 A  Right.

9 Q  Okay. Did Dr. McClellan ever tell you the results of

10 this spirometry report that was conducted in April of

11 2013, April 14 of 2013?

12 A  I had this with me.

13 Q  Did he ever explain it to you, that you recall?

14 A  Not -- What he said was I was having asthma attacks.

15 Q  Okay.

16 A  And I was like, I have never had asthma. That's

17 what -- that's what I told this lady with this, too, is

18 like I played football in school, I have done this, I

19 have never had an asthma attack.

20 Q  Okay. Did he say anything about lung obstruction or --

21 A  Not that I can recall.

22 Q  Okay, that's fine.

---

128

1 A  But, no, I had this thing with me.

2 Q  Okay, that's fine. So then you go to see Dr. -- After

3 you speak with that woman in the gas station, you look

4 up Dr. Knitter?

5 A  I make an appointment to see a pulmonary specialist

6 because I am freaking out. I was like, asthma attacks.

7 That's what this -- it is asthma attacks.

8 Q  Okay. How often -- Before you are seeing Dr. Knitter,

9 how often are you having these attacks that you have

10 described as asthma attacks?

11     MR. PETRUCELLI: I don't think he called them

12 asthma attacks.

13     THE WITNESS: No, the doctor --

14     MR. PETRUCELLI: Dr. McClellan did.

15     THE WITNESS: And he gave me the medicine to

16 take, and that helped.

17 Q  (By Mr. Horvat) Okay. Do you recall what medicine he

18 gave you?

19 A  (By the Witness) The nebulizer medicine.

20 Q  Okay.

21 A  And I believe he gave me a rescue inhaler, too, but I

22 could be wrong.

---

Transcript of Robert Newkirk

33 (129 to 132)

Conducted on February 8, 2017

---

129

1  Q   That's fine.  After Dr. McClellan gives you the
2      nebulizer, how often are you using the nebulizer, do
3      you recall?
4  A   Three times a day, I believe.
5  Q   Okay.  So you are using it three times a day?
6  A   Yeah.
7  Q   Okay.  Then you go see Dr. Knitter?
8  A   Right.
9  Q   Okay.  And what do you describe to Dr. Knitter the
10     first time you see him?
11 A   Well --
12 Q   If you recall.
13 A   I showed him this stuff.
14 Q   Okay.
15 A   And I don't, you know --
16 Q   That's -- that's fine.  If you don't recall, that's
17     perfectly fine.  You showed -- Did you show him the
18     spirometry report from Dr. McClellan?
19 A   I believe so.  He ordered his own, I believe.  I don't
20     know on what date that was.
21 Q   Okay, that's fine.  And does Dr. Knitter diagnose you
22     with COPD?

---

130

1  A   Yes.
2  Q   Okay.
3  A   Yes, he did.
4  Q   And you see Dr. Knitter what, every six months, is that
5      about right?
6  A   Now, yeah.  At first it was not -- it was sooner, more
7      frequent.  Yes.
8  Q   Okay.  Do you recall -- The first time you saw
9      Dr. Knitter, do you recall what tests he performed on
10     you?
11 A   No, I don't.
12 Q   Is Dr. Knitter the only doctor you have treated for at
13     that practice, is he the only doctor you see there?
14 A   Once I seen a Lindsay Potts.
15 Q   Okay.
16 A   I believe her name was Lindsay Potts, that works in his
17     office, too.
18 Q   Is she a doctor or nurse practitioner?
19 A   I believe -- I am not sure.  She might be a nurse
20     practitioner, very well could be.
21 Q   Did you tell -- whenever you were having the coughing
22     with Dr. Weeks, and you told him you had your shortness

---

131

1      of breath, is that correct, you told Dr. Weeks back at
2      that time?
3  A   Yes.
4  Q   In 2011?
5  A   I believe so, in 2013.
6  Q   Okay, okay.  Are you -- I didn't know if you had --
7          MR. PETRUCELLI:  I am just reading it.
8  Q   (By Mr. Horvat)  Okay.  Did you also tell him you
9      worked at the railroad?
10 A   Who, Dr. Weeks?
11 A   Yes.
12 A   Yes, yes.
13 Q   Did you talk to him anything about being exposed to
14     diesel fumes?
15 A   I might have.  I don't know.
16 Q   Okay, that's fine.  What about Dr. McClellan, whenever
17     you saw Dr. McClellan, did --
18 A   I told him I worked on the railroad, too.
19 Q   Did you ever mention anything about diesel?
20 A   Might have.  I don't think so.
21 Q   Okay, that's fine.  And what about Dr. Knitter, have
22     you told him about working at the railroad?

---

132

1  A   Yes.
2  Q   Have you told him about diesel fumes, about possibly
3      being exposed to diesel fumes?
4  A   Actually, I believe he said something about it.
5  Q   Okay.  What did he say to you?
6  A   It could be caused by diesel exhaust, asthma.  Your
7      asthma attacks could be caused by diesel exhaust.
8          MR. PETRUCELLI:  This is Dr. Knitter?
9          THE WITNESS:  Yes.
10         MR. HORVAT:  Dr. Knitter.
11 Q   (By Mr. Horvat)  Do you currently smoke cigarettes?
12 A   (By the Witness)  No.
13 Q   Did you smoke cigarettes at one point in time?
14 A   Yes.
15 Q   When did you start smoking cigarettes?
16 A   I am not sure on the date, but in 30 years, probably
17     17, 18 of them I smoked.
18 Q   Okay.
19 A   On and off.
20 Q   All right.  When did you start smoking cigarettes?
21 A   I was probably 23.
22 Q   Okay.  What type of cigarettes were you smoking at age

---

Transcript of Robert Newkirk
Conducted on February 8, 2017

133

1   23?
2   A   Camels, Camel Lights, Camels.
3   Q   Filtered or unfiltered?
4   A   Filtered.
5   Q   Okay.  How much were you smoking a day, when you were
6       age 23?
7   A   Probably less than a pack.
8   Q   Okay.  I assume by what you said, you quit for a period
9       of time?
10  A   Um-h'm.
11  Q   When was the first time you quit?
12  A   I have no idea.
13  Q   Okay.
14  A   I really — I wouldn't know.
15  Q   Okay.  Had you been smoking for more than, you know, a
16      year, two years?
17  A   I don't know.
18  Q   Okay.
19  A   I really can't — I can't give you an answer on that.
20      It would all be guesses.
21  Q   Okay.  Do you know what decade that was?
22  A   It would be the '80s —

134

1   Q   Okay.
2   A   -- or late '70s.
3   Q   Okay.  How long did you quit for during that first
4       time?
5   A   Maybe a year, maybe two, but that's a guess.
6   Q   I don't want you to guess.
7   A   I am not sure.
8   Q   Okay, that's fine.  When is the next time you quit or
9       stopped smoking?
10  A   I can't answer none of that.  The last time I did was a
11      few years back.  I really -- you know, I don't even
12      know the date on that.
13  Q   Okay.  Were Camels the only brand of cigarettes you
14      smoked?
15  A   No.
16  Q   What other cigarettes did you smoke?
17  A   I smoked Marlboros, Kools, that's --
18  Q   Winstons, did you smoke Winstons?
19  A   Yes.  That's back -- yes.
20  Q   Marlboros, what type of Marlboros I guess did you
21      smoke?
22  A   Regular Marlboros.

135

1   Q   The red pack?
2   A   Yes.
3   Q   Okay.  Filtered?
4   A   Yes.
5   Q   Okay.  The Kools?
6   A   I wasn't into non-filters.
7   Q   All right, that's fine.
8   A   The Milds, Kool Milds.
9   Q   And the Winstons, you don't recall what type of
10      Winstons you smoked?
11  A   Short — I mean the kings.
12  Q   Okay.  Would you kind of -- Did you have a brand you
13      consistently smoked, or whatever was on sale, or --
14  A   Whatever.
15  Q   Okay.  Do you recall when you stopped smoking for good,
16      I guess, do you know when that was, what year?
17  A   No.
18      After you were diagnosed with COPD by Dr. Knitter were
19      you still smoking?
20  A   At first, yes, and that was a struggle.
21      Did you go on any non-smoking -- I -- like Chantix
22      or --

136

1   A   No, I tried that before, but I believe that was with
2       Dr. Weeks.  It was just too expensive.
3   Q   The non-smoking drugs or anti-smoking drugs?
4   A   Yeah, with what I had going on.
5   Q   Were you aware of the warning labels on cigarettes?
6   A   Um-h'm.
7   Q   You have to say --
8   A   Yes.
9   Q   Did Dr. Weeks ever indicate that your COPD may be
10      related to your smoking, to you?
11  A   He told me to quit.
12  Q   Okay.  Did he ever relate that your COPD may have been
13      caused by your smoking?
14  A   Yeah, could very well, yeah.
15  Q   He did say that to you?
16  A   I believe so, but I am not sure.
17  Q   That's -- You know, that's fine.  This is what you can
18      remember, okay.
19  A   But I believe he diagnosed me as acute bronchitis.
20  Q   Okay.
21  A   That's -- When I first started seeing him, that's what
22      it was diagnosed as.  That's one of the reasons why I

Transcript of Robert Newkirk

Conducted on February 8, 2017

35 (137 to 140)

---

**137**

1    went to the other two guys.

2  Q   Okay.

3  A   Because that's what he -- and I -- you know, I don't

4    know.

5  Q   Okay. Have you seen Dr. Weeks since you have been

6    diagnosed with COPD?

7  A   Um-h'm. Yeah.

8  Q   Are you aware that maybe he has told you that your COPD

9    may be related to smoking after you have been

10    diagnosed?

11  A   Yes.

12  Q   Okay. Dr. Knitter, your pulmonologist, has he in any

13    way related or expressed to you that your smoking may

14    have caused or contributed to your COPD?

15  A   Yes.

16  Q   Has he ever advised you to quit smoking, Dr. Knitter?

17  A   Everybody, yeah.

18  Q   Do you recall the last time you had a cigarette?

19  A   No.

20  Q   Do you drink alcohol, sir?

21  A   No.

22  Q   Okay. Did you?

---

**138**

1  A   Yes.

2  Q   Okay. What did you -- What was your drink of choice?

3  A   Beer.

4  Q   When did you stop drinking?

5  A   February of 2003.

6  Q   Okay. Did you ever go to rehab or alcohol --

7  A   Yes, I did.

8  Q   -- counseling? Okay. Do you have any hobbies?

9  A   I like to fish.

10  Q   You like to fish?

11  A   I like to fish, yeah.

12  Q   Can you still fish?

13  A   Not -- not really.

14  Q   Okay.

15  A   Not the way I like to, no.

16  Q   What type of fishing do you do?

17  A   I like to fly fish.

18  Q   Okay.

19  A   To wade.

20  Q   Can you still fly fish?

21  A   From a boat.

22  Q   Okay.

---

**139**

1  A   Yeah. Wading -- Wading ain't happening.

2  Q   Okay.

3  A   I mean, if it does, it ain't very long, and it is

4    tiring.

5  Q   Yeah.

6  A   Imagine that, something that relaxing.

7  Q   Did you go on a fishing trip in 2015 to Colorado?

8  A   Did I go on a fishing trip?

9  Q   Yeah.

10  A   I went out west, I took my fishing poles, but did I

11    fish? No.

12  Q   No.

13  A   But it sure was pretty.

14  Q   You didn't fish out there?

15  A   No.

16  Q   Is there a reason why you didn't fish?

17  A   I did one day.

18  Q   Okay.

19  A   Excuse me.

20  Q   That's fine.

21  A   I just remembered. I fished the South Platte River --

22  Q   Okay.

---

**140**

1  A   -- in Colorado, one day.

2  Q   Sure. Is there a reason you only fished one day?

3  A   Yeah.

4  Q   Is it because of your COPD?

5  A   Yeah.

6  Q   Did you go out on that trip with anybody?

7  A   Yes.

8  Q   Who did you go with?

9  A   I can't think of the name of -- the guide's name. It

10    was a guide.

11  Q   Okay. Did you drive out by yourself?

12  A   I flew out there that time.

13  Q   Okay. By yourself?

14  A   Yes.

15  Q   Okay.

16  A   When I came back, I drove out there with my dog, and I

17    took my fishing stuff, but I never went fishing.

18  Q   Okay. So you were out there twice?

19  A   Yes.

20  Q   When was the first time you were out there, do you

21    recall?

22  A   No.

---

Transcript of Robert Newkirk

36 (141 to 144)

Conducted on February 8, 2017

141

1  Q  Okay.  The second time would have been 2015, the one
2     you referenced?
3  A  Yes.  It was like within two weeks of each other or so.
4  Q  Okay, okay.
5  A  So that's, you know—
6        MR. HORVAT:  I believe I am almost done if
7     you have questions for --
8        MR. PETRUCELLI:  Yeah, I have a few
9     follow-up.
10       MR. HORVAT:  Go ahead.
11       EXAMINATION
12 BY MR. PETRUCELLI:
13 Q  Mr. Newkirk, I would like to talk to you a little bit
14    about your medical history that commences after you
15    moved to Grayling, Michigan, in 2011.  Okay?
16 A  Okay.
17 Q  You established a relationship with Family Practitioner
18    Weeks --
19 A  Correct.
20 Q  -- is that correct?
21 A  Correct.
22 Q  My records from Dr. Weeks show that you saw him on five

142

1     occasions between 10-18-2011 and 5-15-2013.  That's
2     what my records show.
3        My first question to you is, did you have any
4     other family practitioner in the Grayling, Michigan,
5     area between 10-18-2011 and 5-15-2013?
6  A  No.
7  Q  Did you see any other doctors between 10-18-2011 and
8     5-15-2013, other than Dr. Weeks, Dr. McClellan, and
9     Dr. Mast, who is a cardiologist?
10 A  I had stitches in the emergency room in Grayling.  I
11    don't remember the doctors, but I cut my forehead, and
12    he stitched me up in the emergency room.
13 Q  You saw Dr. Weeks -- So the answer to that is the only
14    person that you would have seen -- the only medical
15    practitioner would have been an emergency medicine
16    doctor who stitched your head?
17 A  Correct.
18 Q  Correct?
19 A  Correct.
20 Q  So Exhibit C that was marked by counsel is a medical
21    record that was created by Dr. Weeks, Eric Weeks,
22    arising out of an exam visit that's dated 10-18-2011.

143

1     Okay?
2  A  Okay.
3  Q  He says in the first -- And, of course, you didn't
4     prepare this; correct?
5  A  Correct.
6  Q  These aren't your notes?
7  A  No.
8  Q  These are Dr. Weeks' notes?
9  A  Correct.
10 Q  But he says in this record -- And I am not asking you
11    to verify what he says, but he said "here to get
12    established as a new patient, he has a cough times two
13    weeks.  He has had surgery on left 2008, neck surgery
14    1995, bilat hernia surgery, tonsils."  That's
15    complaining -- that's CC, which means complaining
16    complaints, I think, or presentation of complaints, or
17    it is the complaint section of his -- his chart.
18    Number one, do you remember that you were establishing
19    your -- a new patient relationship with him on or about
20    10-18-2011?
21 A  Correct.
22 Q  Does that sound correct?

144

1  A  Correct.
2  Q  And he writes in this that you said you complained of a
3     cough times two weeks.  Do you recall that as being
4     approximately -- or that being true?
5  A  Could be.
6  Q  I mean, is it or isn't it?
7  A  I believe so.  I am -- I am not sure.
8  Q  So two weeks, you had a cough for two weeks, that is
9     what he writes?
10 A  Oh.
11 Q  You don't dispute that?
12 A  No.
13 Q  On the back of his page, page three of three of
14    Exhibit C, he writes down, diagnosis, quote, acute
15    bronchitis.  Did he tell you that was what was wrong
16    with you?
17 A  That's what I thought, yeah.
18 Q  Okay.  That's just what I -- I was trying to get --
19    flesh this out here.
20 A  Yes.  That's what he told me I had was acute
21    bronchitis.
22 Q  Do you know what the word "acute" means?

Transcript of Robert Newkirk
Conducted on February 8, 2017

145

1  A  Not really.  It is --
2  Q  Acute, do you understand the ordinary meaning of the
3     word "acute"?
4  A  Yes.
5  Q  Meaning it just comes on?
6  A  Right.
7  Q  So you had had a conversation with Dr. Weeks about what
8     was wrong with you when you went to see him for this
9     cough for two weeks; correct?
10 A  Correct.
11 Q  And you remember him telling you -- you don't dispute
12    he says, acute bronchitis?
13 A  Right.
14 Q  You come back to see him for a second visit, according
15    to his records, on 6-5-2012.  Is that consistent with
16    your memory?
17 A  Yes.
18 Q  Do you remember seeing him any time between 10-18-2011
19    and 6-5-2012?
20 A  No.
21 Q  That's -- His records at that time indicate that you
22    were doing a chimney remodeling at your house.  Do you

146

1     recall that?
2  A  Yes.
3  Q  What was -- what was going on there?
4  A  The chimney started sagging in the floor, so I had
5     somebody tear it down and redo it.
6  Q  Were you having problems breathing that you thought was
7     related to --
8  A  Yes.
9  Q  -- with the chimney?
10 A  With the dust or something like that, it stirred up
11    something, that's what I thought.
12 Q  That's why you went to see Dr. Weeks?
13 A  Correct.
14 Q  Did he tell you that you had bronchitis again?
15 A  Yes.
16 Q  The third visit that I have recorded, from you visiting
17    him, would have been on 9-17-2012, where you went in
18    and complained of nasal congestion.  Do you remember
19    making that complaint to him?
20 A  Yes.
21 Q  You don't dispute that?
22 A  No.

147

1  Q  He has got his records.  You don't have any independent
2     records?
3  A  No.
4  Q  What he has written down in his records are his
5     records; correct?
6  A  Right.
7  Q  Do you remember him telling you acute bronchitis again?
8  A  Yeah.  That's what he had me for, for a while.
9  Q  Okay.  So then the fourth visit that I have, that from
10    his records is 3-19-13 -- March 19th, 2013, that's the
11    fourth visit you have had with him over a period of
12    about 18 months, from 10-18-2011 through 3-19-2013, and
13    this time, you talk about the shortness of breath to
14    him; correct?
15 A  (Witness nodded head.)
16 Q  True?
17 A  Yes.
18 Q  And he is a general practitioner; correct?
19 A  Right.
20 Q  There was a discussion at that meeting about a heart
21    test of some kind, a stress test, do you remember that?
22 A  Right, because -- Yeah.

148

1  Q  How did -- What was that all about, what's the stress
2     test all about?
3  A  I thought maybe I was having problems with my heart,
4     with the shortness of breath.
5  Q  Okay.  Do you remember what Dr. Weeks told you?
6  A  Not offhand, I don't.
7  Q  Did he arrange for you to see a cardiologist?
8  A  Yes.
9  Q  And did he arrange for you to have a stress test done?
10 A  Yes.
11 Q  And that was with or through Dr. Mast?
12 A  That -- Yeah, that was -- would be correct.  That's it.
13 Q  So in March of 2013, the shortness of breath and other
14    problems you were having, at least in your mind and
15    Dr. Weeks' mind, it could be cardiac related?
16 A  Yes.
17 Q  And you wanted to see if it was cardiac related; true?
18 A  Yeah.  I wanted to find out what was going on, it
19    wasn't right.
20 Q  Okay.  So you went to see Dr. Mast and had the
21    cardiac -- had the stress test?
22 A  Right.

Transcript of Robert Newkirk

Conducted on February 8, 2017

---

149

1  Q   The records show that was done in May of 2013. Is that
2      consistent with your memory of when it was done?
3  A   Yeah.
4  Q   What was the results of the test, as far as you are
5      aware?
6  A   I was okay.
7  Q   You didn't have any heart condition?
8  A   No.
9  Q   The heart wasn't causing your shortness of breath?
10 A   Correct.
11 Q   Okay. You understood that, if you had a coronary
12     condition of some kind, that could cause shortness of
13     breath?
14 A   Correct.
15        MR. HORVAT: Objection.
16 Q   (By Mr. Petrucelli) Did you know that to be a fact?
17 A   (By the Witness) Yes.
18 Q   That's why you wanted to have your heart checked out?
19 A   (Witness nodded head.)
20 Q   You -- True?
21 A   True.
22 Q   Then you see this Dr. McClellan two times in April of

---

150

1      2013; correct?
2  A   Correct.
3  Q   That's April 15th and April 29th, you saw him twice?
4  A   Right.
5  Q   He is telling you about the carpet, removing it from
6      your house. Is he the doctor that told you to do that?
7  A   Yes, the dust mites.
8  Q   And you did that?
9  A   Yeah.
10 Q   And he told you to stop smoking?
11 A   Yes.
12 Q   And he told you you had asthma?
13 A   Yes.
14 Q   And then, as a result of those meetings, and this
15     conversation with the woman at the gas station, you
16     decide to try to find somebody to figure out what's
17     going on with your pulmonary condition?
18 A   Um-h'm.
19 Q   Is that right?
20 A   Yes.
21 Q   I mean, who is this woman in the gas station? I don't
22     understand this. I mean, why would you talk to a woman

---

151

1      in a gas station about this?
2  A   She had a medical uniform on.
3  Q   Oh, she didn't work there?
4  A   She didn't work at the gas station.
5  Q   She looked like a medical provider to you?
6  A   Right, right. And the name -- the neighbor lady said
7      the same thing, you know.
8  Q   What do you mean, the neighbor lady said the same
9      thing?
10 A   Yeah. She worked with elderly people. I asked her
11     about it. She said, yeah, you should talk to a
12     pulmonary specialist. So two people said the same
13     thing, so I looked and made a pulmonary specialist
14     appointment.
15 Q   When you would see -- when you saw Dr. Weeks,
16     Dr. McClellan, Dr. Mast, Dr. Knitter, they would all
17     ask you basic history about who you were, where you
18     worked, what you did?
19 A   Right.
20 Q   Is that correct?
21 A   Correct.
22 Q   And you would answer their questions to the best of

---

152

1      your ability?
2  A   Correct. Correct.
3  Q   Did any doctor, prior to Dr. Knitter, ever tell you
4      that your respiratory disorder was caused or
5      contributed to inhalation of diesel fumes while you
6      worked for the railroad?
7        MR. HORVAT: Objection.
8  Q   (By Mr. Petrucelli) Did any doctor ever tell you that?
9  A   (By the Witness) Knitter.
10 Q   Knitter is the first doctor?
11 A   Right. And --
12 Q   Okay. I just --
13 A   Can I correct something? I made a mistake there.
14     After Knitter told me that, I did mention that to
15     Dr. Weeks, about diesel exhaust.
16 Q   Okay.
17        MR. HORVAT: That's fine.
18 Q   (By Mr. Petrucelli) So the first doctor that you ever
19     learned that your respiratory condition was related to
20     diesel -- inhalation of diesel fumes is Dr. Knitter?
21 A   (By the Witness) Correct.
22 Q   There is a note in Dr. Knitter's records, 11-26-13. By

---

Transcript of Robert Newkirk
Conducted on February 8, 2017

39 (153 to 156)

153

1 the way, you started seeing Dr. Knitter, from my
2 records and my review of his records, in June of 2013?
3 A   That would be about right.
4 Q   June 28th is the note of the first visit; correct?
5 A   Yeah.
6 Q   That's what my notes say.
7 A   Yeah. I don't have it right in my hand.
8 Q   Is that consistent with your memory?
9 A   Yes.
10 Q   So you saw him on 6-28-13, 7-9-2013, 7-18-2013,
11   8-13-2013, 9-16-2013, 11-26-2013, according to my
12   records. Okay?
13 A   Yeah.
14 Q   I mean, you remember going to see him --
15 A   Yes.
16 Q   -- almost monthly?
17 A   Yes. When I first started, yes.
18 Q   And his records speak for themselves, of course, on
19   what he was doing, and what he was trying to find out,
20   but there is a note I want to talk to you about. Okay?
21 A   Yeah.
22 Q   There is a written record, and it is dated 11-26-13,

154

1   11 -- November 26, 2013, he concluded, in a note that
2   results from PFTs -- Do you know what a PFT is?
3 A   No.
4 Q   Pulmonary function test.
5 A   Okay.
6 Q   Do you remember having those?
7 A   Yeah.
8 Q   He says you were -- he said by then you were suffering
9   from severe COPD without any contributing factors, such
10   as allergy or any sort of deficiency of blood. Do you
11   understand that?
12 A   Yes.
13 Q   He told you that?
14       MR. HORVAT: Objection.
15 Q   (By Mr. Petrucelli) Do you remember him telling you
16   that?
17 A   (By the Witness) Yes.
18 Q   He wrote in -- he wrote in his records -- there is a
19   record, quote, it is my -- and this is on 11-26-2013,
20   it is my reasoned medical opinion that his respiratory
21   disease is a result of multiple inhaled irritants.
22   While his tobacco consumption did play a role, I feel

155

1   his long-term exposure as a diesel engineer also played
2   a significant contributing factor. Do you remember
3   ever seeing that note?
4 A   Yes.
5 Q   Okay. My question to you is, you know that as of 11 --
6   Did he give you a copy of that note?
7 A   Yes.
8 Q   Did he give it to you on or about 11-26-2013?
9 A   I believe so.
10 Q   Is that the first time anybody had ever told you that
11   your long-term exposure as a diesel engineer played a
12   significant contributing factor?
13       MR. HORVAT: Objection.
14 A   (By the Witness) Yes.
15 Q   (By Mr. Petrucelli) I don't see any entry by
16   Dr. McLain (sic), Weeks, Mast, or any other doctor,
17   ever linking up to you or in their records, that your
18   pulmonary disorder was related to diesel exposure.
19       MR. HORVAT: Objection.
20 A   (By the Witness) That's true.
21 Q   (By Mr. Petrucelli) So my question is, did -- the
22   first time anybody ever told you about this link was

156

1   Dr. Knitter?
2 A   Correct.
3       MR. HORVAT: Objection.
4 Q   (By Mr. Petrucelli) Did you -- What -- When is the
5   first time you ever learned of a vascular -- or a
6   respiratory disease known as pulmonary obstruction
7   disease?
8 A   (By the Witness) I never --
9 Q   Or COPD, chronic obstructive pulmonary disease.
10 A   When did I learn about it?
11 Q   Yeah. When is the first time you ever heard of that
12   disease, when you were seeing these doctors?
13 A   Yes. And I really didn't quite understand it. I know
14   that sounds stupid, but that's --
15 Q   And this note -- this note of Exhibit B?
16 A   I don't ever remember him telling me that.
17 Q   Okay. Who is Dr. Reynolds? Who is the Reynolds
18   Clinic?
19 A   That was the Reynolds Clinic.
20 Q   What is it?
21 A   It is just a clinic, like an emergency room clinic, or
22   a doctor's clinic on Reynolds Street in Toledo, Ohio.

Transcript of Robert Newkirk
Conducted on February 8, 2017

---

157

1  Q   And it says on the top, "Today's Complaint," and it is
2      highlighted in yellow.  I mean, this is the only thing
3      it says, "wants to quit smoking"?
4  A   Um-h'm.  (Witness nodded head.)
5  Q   I take it you probably wanted to quit smoking for many
6      years during your life?
7  A   Oh, yeah.
8  Q   Including on 9-29-09?
9  A   Correct.
10 Q   There is no other complaints mentioned on there?
11 A   No.
12 Q   Do you even remember being there on 9-29-09?
13 A   No.
14 Q   And the plan of treatment, I can't even make out what
15     it says, but do you know if there was any treatment
16     that he gave you?  Was it -- was this -- was there some
17     kind of drug called -- Did you take a particular kind
18     of drug to quit smoking?
19 A   No.  Only from -- I had a prescription from Dr. Weeks
20     for that Chantix one.  I --
21 Q   Well, I don't know if this says Chantix.  I don't
22     really even know what this one word plan of treatment

---

158

1      is.  But there was not any -- you don't remember any
2      treatment that this doctor -- Reynolds Clinic gave you?
3          MR. HORVAT:  Objection.  The record speaks
4      for itself.
5  A   (By the Witness)  No.
6  Q   Do you remember any clinic -- any treatment that was
7      provided by the Reynolds Clinic?
8          MR. HORVAT:  Objection.
9  A   (By the Witness)  No.
10 Q   (By Mr. Petrucelli)  When you worked for the railroad,
11     from the time you started until the time you last
12     worked there, did anyone at the railroad ever tell you
13     that exposure to diesel fumes could cause you to suffer
14     a respiratory disease?
15 A   Not that I recall.
16         MR. HORVAT:  Objection.
17 Q   (By Mr. Petrucelli)  Did the railroad, while you worked
18     there, ever have you seen by a pulmonologist?
19 A   (By the Witness)  No.
20 Q   You didn't have any pulmonology tests while you worked
21     at the railroad?
22 A   No.

---

159

1          MR. HORVAT:  Objection.
2  Q   (By Mr. Petrucelli)  When they -- when you -- When you
3      moved the carpet out of your house, after Dr. McClellan
4      told you to tell --
5  A   (By the Witness)  Yeah.
6  Q   In April of 2013, when he told you to take the carpet
7      out, did that help?  Did your breathing ever get
8      better?
9  A   No.  No.  I only took it from the fireplace, like five
10     foot, yeah.
11 Q   It didn't help?
12 A   No.
13 Q   But you did what he told you?
14 A   Yeah.
15 Q   And you believed him, otherwise you wouldn't have done
16     it, I take it; correct?
17 A   Right.
18 Q   Had you ever heard of bronchitis before 10-18-2011?
19 A   No.
20 Q   You never had any diagnosis like that before?
21 A   Not that I recall.
22 Q   You really didn't know what it meant?

---

160

1  A   No.  No, I didn't.
2  Q   Just so we are clear on something.  You also told
3      Dr. Weeks, the first time you saw him, that you wanted
4      to be weaned off of your morphine on that occasion;
5      correct?
6  A   Correct.
7  Q   And did he refer you to a doctor for that?
8  A   No.
9  Q   He didn't?
10 A   No.  He said I should go to a --
11 Q   A pain clinic?
12 A   No.  I -- A pain clinic or a facility for to get clean,
13     or whatever.  It's like I don't need that.  I already
14     went through an alcohol thing.  I know what's going on.
15     Is there anything that you can give me to help me with
16     the withdrawals?  No, you have got to go to -- Well,
17     hey, so I did it cold turkey.
18 Q   So you just quit taking them?
19 A   Yeah.
20 Q   So you --
21 A   I was sick for like two weeks.
22 Q   Okay.  So you haven't taken any pain medication for the

---

Transcript of Robert Newkirk
Conducted on February 8, 2017

161

1    neck problems since you went cold turkey?
2  A  Correct.
3  Q  And was that after you saw Dr. Weeks in 2011?
4  A  Yeah.
5  Q  10-18-2011?
6  A  Yeah.
7  Q  So you didn't see a doctor?
8  A  No.
9  Q  Didn't go to a pain clinic?
10 A  No. I have already went through all of that.
11 Q  I am just saying, you didn't do that?
12 A  No. I know if you take an alcoholic and an opium
13    addict --
14 Q  No, no, no. I didn't ask all of those questions.
15 A  Okay.
16 Q  I just said, you didn't see a doctor --
17 A  Correct.
18 Q  -- to withdraw --
19 A  Correct.
20 Q  -- the use of those medications?
21 A  Correct.
22 Q  And those were prescribed medications?

162

1  A  Correct.
2  Q  So since 2013 and the diagnosis, what's the trajectory
3     of the -- of your condition? Has it -- has it stayed
4     the same, got worse, got better, what?
5  A  It ain't going to get better.
6  Q  Has it -- What's the trajectory, has it gotten worse?
7  A  Well, yeah. There is only one way it is going to go,
8     is when I go in the ground.
9  Q  Well, that's probably true for all of us.
10 A  I -- Yeah. None of us are getting out of here alive.
11    I am just going to beat a lot of people to it.
12 Q  I am just asking you to tell us, if you would --
13 A  My prognosis?
14 Q  No, I didn't ask you for that.
15 A  What are you asking?
16 Q  I am asking you a very simple question, have you gotten
17    worse --
18 A  Yes.
19 Q  -- since 2013?
20 A  Yes, a lot worse.
21 Q  And you continue to see -- and have continued to see
22    Dr. Knitter for care and treatment?

163

1  A  Correct.
2  Q  You sold your home -- you told us that you sold your
3     home in December of 2016?
4  A  Correct.
5  Q  What prompted you to do that?
6  A  I couldn't take care of it no more. I couldn't afford
7     to pay other people to take care of it. It was
8     breaking me.
9  Q  You were physically incapable of doing it?
10 A  Correct.
11 Q  And what physical impairments prevented you from taking
12    care of it?
13 A  My lungs.
14    (Discussion off the record.)
15 Q  (By Mr. Petrucelli) You haven't smoked since 2013,
16    since --
17 A  (By the Witness) Oh, I -- I have smoked --
18    MR. HORVAT: Objection.
19 A  (By the Witness) -- after that.
20 Q  (By Mr. Petrucelli) When did you stop completely?
21 A  I am not sure on the date. It is -- you know, I really
22    can't say.

164

1  Q  What year? You have stopped?
2  A  Yes. I -- Yeah, I am not smoking.
3  Q  Okay. Now, you have lost weight over the last four
4     years; correct?
5  A  Yeah.
6  Q  What is your present weight?
7  A  120.
8  Q  120. What was your weight when you saw Dr. --
9     Dr. Weeks in --
10 A  I am not sure, about 160.
11 Q  What do you ascribe your weight loss to?
12 A  This disease. Can I go to the bathroom?
13    (Discussion off the record.)
14    MR. PETRUCELLI: I don't have any further
15    questions. Thank you.
16    MR. HORVAT: I just have a couple of
17    follow-up, sir.
18    EXAMINATION
19 BY MR. HORVAT:
20 Q  We talked a little about smoking, and we talked about
21    the warning labels on cigarettes. Do you recall them
22    stating that they could cause lung or respiratory

Transcript of Robert Newkirk
Conducted on February 8, 2017

---

165

1     issues, the warning labels?
2   A   Yes.
3   Q   And you still continued to smoke, sir, despite those
4       warnings labels?
5   A   Yes.  Correct, I did.
6   Q   You talked with your attorney about having to sell your
7       home because you couldn't take care of it?
8   A   Right.
9   Q   And you couldn't afford to pay people to help you take
10      care of it; correct?
11  A   And plus where it was at, with the winter and the
12      summer.
13  Q   Did you have to pay anybody to do any work around the
14      house?
15  A   Yeah.
16  Q   Okay.  Who did you have to pay?
17  A   People that cut my lawn.
18  Q   Okay.
19  A   Did the snowplowing.
20  Q   Okay.
21  A   Or if I needed something fixed, wood, yeah.
22  Q   Okay.  Did you previously do that stuff yourself?

---

166

1   A   Yeah.
2   Q   Okay.
3   A   Yeah, you — I enjoyed chopping wood.
4   Q   Okay.  When did you stop chopping wood, or cutting the
5       grass, or shoveling your driveway, or plowing your
6       driveway?
7   A   Probably — I never plowed my driveway.
8   Q   Okay.
9   A   I paid for that to be done because it was such a long
10      driveway.
11  Q   Okay.  Can I ask you this, did you pay for someone to
12      plow your driveway before you got diagnosed with COPD?
13  A   Yes.
14  Q   Okay.
15  A   I never shoveled my driveway or never plowed it.  I
16      hired it out.
17  Q   Okay.  And you had to pay someone to chop wood for you?
18  A   I — Yeah, I did.
19  Q   That was because of your diagnosis of COPD?
20  A   Yes.
21  Q   Okay.
22  A   I mean the first two years, I did it.  I struggled.  It

---

167

1       started getting harder and harder.
2   Q   Okay.
3   A   So, yeah, I paid people to give me a hand.
4   Q   Okay.  How much did you pay someone to chop the wood?
5   A   Maybe — It depended on the — like ten bucks a cord, a
6       face cord, or whatever.
7   Q   Okay.  Do you know how many times you had to do that,
8       pay someone ten bucks?
9   A   Every year.
10  Q   Okay.  For how many years?
11  A   What was I there, six — well, ever since the second
12      year there, third year there, starting on the third
13      year there, so three years.
14  Q   Okay.  And what about cutting your grass, did you have
15      to pay someone to cut your grass?
16  A   Yes.
17  Q   Okay.  How -- What did you pay them?
18  A   Thirty-five — thirty-five bucks a time.
19  Q   Okay.  And --
20  A   I got a lawn service guy.
21  Q   Okay.  And the reason -- Was one of the reasons why you
22      hired the lawn service guy because of your COPD?

---

168

1   A   Yeah.
2   Q   Okay.  Previously, did you cut the grass yourself?
3   A   I gave the job to the neighbor kid.
4   Q   Okay.
5   A   I — I had a lawn mower.  I would do it or --
6   Q   Okay.
7   A   His family needed kind of help, so I -- I kind of like
8       gave him a job to help them out, and they ended up
9       being not the very best people.
10  Q   Okay.  But you couldn't cut the grass because of your
11      COPD, is that right, or is that not right?
12  A   At first I could.
13  Q   Okay.
14  A   But as the time went on, I couldn't.  That's when I --
15  Q   Hired the lawn service?
16  A   -- hired a lawn service to take care of that stuff.
17  Q   Do you approximately know how much you spent on that
18      lawn care service?
19  A   Probably 70 bucks a month.
20  Q   For how many years?
21  A   Three.
22  Q   And that would have only been in the summertime

---

Transcript of Robert Newkirk
Conducted on February 8, 2017

---

169

1   obviously?
2   A   **Right.**
3          MR. HORVAT:  I am just showing him the
4   11-26-13 from Dr. Knitter that you talked about.
5          MR. PETRUCELLI:  Yeah.  Do you want to mark
6   this?
7          (Exhibit E marked for identification.)
8   Q   (By Mr. Horvat)  I am going to show you this record.
9   Maybe you can help enlighten me.  It is 11-26 -- dated
10  11-26-2013.  It is a record from Dr. Knitter.  I have
11  highlighted a portion.  It says -- Under "Impression,"
12  it says, "Dear Sirs."  Do you have any idea who he is
13  addressing that to, Dr. Knitter?
14  A   **(By the Witness)  No, I don't.**
15  Q   Okay.
16         MR. PETRUCELLI:  Could be me.  Could be
17  anybody.
18         MR. HORVAT:  I want just to see if he knows.
19         MR. PETRUCELLI:  Dear sirs, I am a sir.
20  A   **(By the Witness)  No, I really don't.**
21         MR. HORVAT:  Okay.
22         MR. PETRUCELLI:  Question better left for

---

170

1   Dr. Knitter.
2          MR. HORVAT:  I am sure I will talk to
3   Dr. Knitter.
4   Q   (By Mr. Horvat)  Did you ever have a previous diesel
5   fume claim or suit before this?
6   A   **(By the Witness)  No.**
7   Q   Okay.  Did you ever retain an attorney prior to
8   Mr. Petrucelli?
9   A   **No.**
10  Q   Okay.  Does the firm of Holland Groves ring a bell?
11  A   **Oh, I talked to them.**
12  Q   Do you know when you talked to Holland Groves?
13  A   **No, I don't.**
14  Q   Do you know what year?
15  A   **No, I don't.  I also talked to Collins & Collins.**
16  Q   Okay.  Do you recall when you spoke to Mr. Collins or
17  Mr. Holland?
18  A   **No, I don't.  No, I don't.**
19  Q   That would have been as a result of diesel fume -- your
20  diesel issues?
21  A   **Yes.**
22  Q   Or your COPD?

---

171

1   A   **Yes.  I didn't know -- Well, excuse me.**
2   Q   That's okay.  How did you get their numbers or contact
3   information?
4   A   **Internet.**
5   Q   Okay.
6   A   **And my ex-union man, Davie Fernald, works with them,**
7   **Holland & Holland --**
8   Q   Okay, very good.
9   A   **-- as an investigator.**
10         MR. HORVAT:  Okay.  That's fine.  That's all
11  I have.
12         EXAMINATION
13  BY MR. PETRUCELLI:
14  Q   So would you have contacted those lawyers after the
15  Knitter report of 11-26 --
16  A   **I believe I did.**
17  Q   -- 2013?
18  A   **I believe.**
19         MR. HORVAT:  Objection.
20         THE WITNESS:  I believe I did.
21         MR. HORVAT:  But you don't know for sure?
22         THE WITNESS:  No.

---

172

1   Q   (By Mr. Petrucelli)  Is it your best memory that you
2   would have been contacting them after the Knitter
3   report?
4          MR. HORVAT:  Objection.
5   A   **(By the Witness)  Yes.**
6   Q   (By Mr. Petrucelli)  Is that your testimony?
7   A   **Yes.**
8          MR. HORVAT:  That's all I have for you,
9   Mr. Newkirk.
10         MR. PETRUCELLI:  Thank you, Mr. Newkirk.
11         * * * * *
12         (The deposition concluded at about 1:32 p.m. CST)
13
14
15
16
17
18
19
20
21
22

---

Transcript of Robert Newkirk
Conducted on February 8, 2017

173

1   STATE OF MICHIGAN  )
                       )
2   COUNTY OF MARQUETTE )
3       I certify that this transcript, consisting of 153
4   pages, is a complete, true, and correct record of the
5   testimony of ROBERT NEWKIRK, held in this case on
6   February 8, 2017.
7       I also certify that prior to taking this
8   deposition ROBERT NEWKIRK was duly sworn to tell the
9   truth.
10      That said testimony was taken by me stenographically
11  and thereafter reduced to typewriting under my direction;
12  that reading and signing was not requested; and that I
13  am neither counsel for, related to, nor employed by any
14  of the parties to this case and have no interest,
15  financial or otherwise, in its outcome.
16      In Witness whereof, I have hereunto set my hand and
17  affixed my notarial seal this 13th day of February, 2017.
18  My commission expires:  November 11, 2022.
19
    Date          Sandra A. Larson, CSR-2916, RMR
20
21
22

# Safety Analysis Report

**Re:    Robert Newkirk v. Consolidated Rail Corp and Norfolk
Southern Railway Co., In the United States District Court
District of Michigan Southern Division.**

### 1.0    Scope of Opinion

The law firm of Petrucelli Waara, located at 328 West Genesee Street, P.O. Box AA, Iron River, Michigan 49935, retained the services of George A. Gavalla to review relevant materials; review safety rules, procedures and standards; examine relevant documents; review testimony and evidence obtained through discovery relative to the case of *Robert Newkirk v. Consolidated Rail Corp and Norfolk Southern Railway Co., In the United States District Court District of Michigan Southern Division.* I was asked to offer opinions, within a reasonable degree of professional certainty within my area of expertise in railroad safety, regarding standards of care embodied in railroad safety laws and regulations relating to the control of diesel exhaust gasses in railroad locomotives. More specifically, I was asked to offer opinions, within a reasonable degree of certainty within my area of expertise in railroad safety, regarding the following questions:

   1) Whether the entrance of diesel exhaust gasses into the occupied cab of locomotives constitutes a violation of Federal Locomotive Safety Standards 49 CFR Part 229.43 (a);

   2) Whether the conditions reported by Robert Newkirk while employed by the defendant railroads namely, the entrance of diesel exhaust gasses into locomotive cabs from underneath floor boards, through electrical cabinets, through heater blowers, and from outside air leaks around doors and windows, constitute violations of Federal Locomotive Safety Standard – 49 CFR Part 229.43 (a); and

   3) Whether the Federal Locomotive Safety Standards – 49 CFR Part 229.43 (a) is a strict liability standard which requires railroads to ensure that their locomotive cabs remain free of diesel exhaust gasses at all times when a locomotive is in service or offered for service, regardless of whether the railroad had prior knowledge of the diesel exhaust gas leaks.   The following is a report of my findings and opinions within a reasonable degree of certainty within my area of expertise in railroad safety.

### 2.0    Statement of Qualifications

I, George Gavalla, have 40 years experience in the railroad industry and possess substantial railroad safety expertise.  I began my railroad career in 1976 as an employee of Consolidated Rail Corporation.  In 1995, I joined the Federal Railroad Administration (FRA) as a Safety Project Coordinator, where I led large scale railroad safety audits of major railroads.

In October 1997, I became head of the FRA Office of Safety, the largest office within FRA with over 70 percent of the agency's personnel, and served in that capacity until early 2004.  As the senior official in the Office of Safety, I was tasked with overseeing the safety of our nation's railroads, promulgating new and revised Federal railroad safety regulations, overseeing the enforcement of Federal railroad safety regulations and conducting railroad accident investigations.   During my tenure, railroad related fatalities

Safety Analysis Report 12/11/2016



declined to their lowest levels in history; total railroad related deaths declined by 19 percent, while railroad employee fatalities declined 48 percent.

Also I have substantial knowledge and experience regarding locomotive inspection and maintenance regulations and practices.  For example, from 1996 through October of 1997, I led FRA's Safety Assurance and Compliance Program audit of Amtrak and of the Union Pacific, large scale, comprehensive safety audits involving all of these railroads' operations; including their locomotive maintenance and inspection practices. These safety audits included investigations of safety issues and compliance with Federal railroad safety standards related to locomotives.

I posses firsthand knowledge of Federal locomotive inspection and maintenance requirements, having periodically accompanied FRA Motive Power and Equipment (MP&E) Safety Inspectors during on-site inspections of locomotives and locomotive maintenance facilities.  Also, I have read technical publications and had frequent professional consultations, briefings, meetings and correspondence with both FRA and railroad industry locomotive safety experts regarding locomotive safety issues.   Finally, during my tenure, I directed the FRA MP&E staff to revise the agency's guidance regarding the enforcement of Federal safety regulations for locomotives and railroad cars. I provided the final level of review, comment and approval of the revised enforcement guidance.

A copy of my Curriculum Vitae is provided in Appendix A of this report.

### 3.0    Fee Schedule

A copy of my Fee Schedule is attached as Appendix B of this report.

### 4.0    Statement of Facts

Robert Newkirk was hired by Consolidated Rail Corporation (Conrail) in 1976 as a laborer in its diesel shop in Grand Rapids, Michigan.  Beginning in 1977 thru 1978, Mr. Newkirk worked for Conrail as a fireman aboard diesel locomotives.  Beginning in 1979 he was promoted to a locomotive engineer's position, operating diesel locomotives, and worked as a locomotive engineer for Conrail thru 1999 when the railroad became part of the Norfolk Southern (NS) railroad.  At that time, Mr. Newkirk became employed by NS and worked until 2005 as an engineer operating diesel locomotives. (Complaint and Jury Demand, P. 3)

Mr. Newkirk has indicated that during his employment with Conrail and NS, he was continuously exposed to diesel exhaust which would infiltrate into the locomotive cabs through holes in the floor, cracks in window and door seals and through the equipment compartment of the locomotives. (Complaint and Jury Demand, P. 3)

The Federal Railroad Administration (FRA) issued Locomotive Safety Standards that address various aspects of locomotive safety, including the control of exhaust gasses.

These standards were first issued in Federal railroad safety regulation 49 CFR Part 230. In 1980 this regulation was revised so that non-steam locomotive safety standards were removed from the regulation and placed in a new regulation 49 CFR Part 229.   Both the older and newer regulation contained provisions regarding the control of exhaust gasses in locomotives. The current locomotive safety standard contain a provision known as 49 CFR §229.43 (a) which states:

> §229.43  Exhaust and battery gasses.
> (a) Products of combustion shall be released entirely outside the cab and other compartments. Exhaust stacks shall be of sufficient height or other means provided to prevent entry of products of combustion into the cab or other compartments under usual operating conditions

FRA also issues guidance to FRA inspectors regarding the application of the provisions of 49 CFR Part 229.   This guidance is found in the FRA Motive Power and Equipment Compliance Manual, which is available to the public on the FRA web site.

On March 14,1978, FRA and the Occupational Safety and Health Administration (OSHA) issued a joint policy statement delineated their respective regulatory agency jurisdictions in regards to the railroad industry.  That statement declared that FRA's regulations, not OSHA's, were applicable regarding the regulation of air contaminants in locomotive cabs.

> Toxic and Hazardous Substances (Subpart Z) - The OSHA regulations apply according to their terms, except with respect to . . .the regulation of air contaminants in locomotive cab and caboose environments.  . . .  Specific FRA regulations bearing on the locomotive cab environment address cab ventilation. (49 CFR §230.229 (f) (2)) and exhaust gasses (49 CFR §230.259) . . .it is possible that situations may exist in which short-tem exposure which meets OSHA standards may still affect the ability of employees properly to perform their duties and many cause serious discomfort. (FR Vol. 43, No. 50, P. 10589 – Tuesday, March 14, 1978)

49 CFR §230.259 was subsequently recodified as 49 CFR §229.43(a) in 1980 when the FRA revised 49 CFR Part 230 by separating out provisions regarding non-steam locomotives and placing them in a new regulation 49 CFR Part 229. (See FR Vol. 45 No. 63 – Monday, March 31, 1980.)

FRA also conducted a study of locomotive safety and locomotive cab working conditions that investigated issues related to entry of airborne diesel exhaust gasses into locomotive cabs from outside the locomotive.  This study was described in an FRA report to Congress in 1996.

## 5.0   Information Reviewed

A list of the information reviewed in conducting this evaluation is contained in Appendix C of this report.

## 6.0     Findings and Opinions

The methodology that I typically employ in the analysis of accident, injury or illness cases is based on root cause analysis, which examines work place incidents in the broad context of the total work environment in which the indent(s) or injuries occurred. This methodology, sometimes referred to as a systems approach to safety, examines all factors that have the potential to cause, contribute to or permit an accident to occur and analyzes them as part of a complex whole to determine the links, if any, between the various factors and the accident event itself. This approach is widely utilized in the investigation of industrial accidents and is the methodology that the Federal Railroad Administration (FRA) Accident Investigation Guidelines which state "This level of investigation not only establishes the root cause(s) of the accident, but also determines the conditions and situations that led to the accident. . . . By determining the antecedents of the accident, appropriate remedial actions can be taken to prevent future similar occurrences. (FRA General Manual 2009; Chapter 4 - Accident Investigation Guidelines P. 38)

Also, I utilized my specialized knowledge and experience in railroad safety; especially the application of complex railroad operating and safety rules, procedures and practices and the application of complex railroad safety regulations and standards, to provide relevant information to assist the triers of fact in understanding the issues in reaching their decisions.

While I do not purport to speak for the FRA, the federal agency that promulgates our nation's safety regulations and standards, I am aware of the many policy and regulatory documents where FRA describes the purpose, intent and application of railroad safety regulations, standards, guidelines and recommendations and I provide this information when analyzing the issues and rely on this knowledge when formulating my opinions.

Railroads are required to conduct their day-to-day operations in accordance with relevant Federal and state railroad safety regulations and standards. To accomplish this, it is necessary for railroads and railroad workers to understand how to apply those regulations and standards to everyday railroad work activities and the railroad environment. Throughout my career as a railroad safety professional, I too, was required to understand how Federal and state regulations and standards apply to everyday railroad work activities and railroad work environment. I relied on this knowledge when formulating my findings and opinions.

Similarly the railroad industry has devised various industry standards and best practices to ensure the safety of railroad operations and railroad workers. Furthermore, individual railroads have their own rules, standards, procedures and practices for the purpose of ensuring the safety of railroad operations and the railroad workforce. However, to accomplish this purpose, it is necessary for individual railroads to apply these industry standards and company rules, procedures and practices to their everyday work activities and the work environment. Again, during my career as a railroad safety professional, it was necessary for me to understand how railroad industry standards and company rules, procedures and practices apply to everyday railroad work activities and railroad work environment. I relied on this knowledge when formulating my findings and opinions.

Safety Analysis Report 12/11/2016                                                    4

During my career as a railroad safety professional, it was often necessary for me to be involved in the investigation of railroad accidents and incidents to determine the likely cause(s) and contributing factors.  To carryout these investigations it was necessary to consider the vast complex of governmental, industry and company directives and guidelines to identify specific regulations, standards, rules that were relevant to the facts and circumstances surrounding the accident or incident. Also, it was necessary to analyze the facts surrounding the accident or incident to determine cause(s) and contributing factors and determine whether the relevant regulations, standards, rules, procedures and practices were properly applied.  I followed this methodology when formulating my findings and opinions for this case.

The following opinions are based on my background, education, experience and information provided thus far and are stated within a reasonable degree of certainty within my area of expertise in railroad safety.

### 6.1    Locomotive Cabs to Be Kept Free of Diesel Exhaust Gasses

The first question to be considered is whether the entrance of diesel exhaust gasses into the occupied cab of locomotives constitutes a violation of Federal Locomotive Safety Standards 49 CFR §229.43 (a).  To answer this question one must first look to the plain language of the standard itself. 49 CFR §229.43 (a) states:

> **§229.43   Exhaust and battery gasses.**
> **(a) Products of combustion shall be released <u>entirely</u> outside the cab and other compartments. Exhaust stacks** shall be of sufficient **height** or **<u>other means provided</u> to prevent entry of products of combustion into the ca**b or other compartments under usual operating conditions. (Emphasis added)

The railroad industry standard of care regarding diesel exhaust gasses from railroad locomotives, as embodied in 49 CFR §229.43 (a), is clear and unequivocal in stating such diesel exhaust gasses must be "released <u>entirely</u> outside the locomotive cab. "  Therefore, it is unacceptable for diesel exhaust gasses generated by a locomotive's diesel engine to be released inside the locomotive cab.

Diesel exhaust leaks occur inside the engine compartment of a locomotive, typically through cracks in the exhaust manifold, exhaust manifold gasket or expansion bellows.  Once inside the engine compartment, diesel exhaust gasses can migrate into the locomotive cab through electrical cabinets or from under the floorboards of the locomotive cab.  (See Attachment No. 1)   While modern locomotives are typically designed with pressurized engine compartments intend to promote the exhaustion of diesel fumes from the exhaust stack, leaks in a locomotives diesel exhaust system still have the potential to migrate into the cab.

The standard of care set forth in 49 CFR §229.43 (a) calls for diesel exhaust gasses to be released "entirely outside the cab or other compartments."  Therefore, it is unacceptable

and contrary to the aforementioned standard of care whenever exhaust gasses from a locomotive are released into the engine compartment and enter the cab.  If an FRA inspector were to find diesel exhaust gasses entering a locomotive cab from the engine compartment, he or she would take exception and require remedial action be taken to rectify the condition.

Because of the hazards associated with diesel exhaust gasses, the standard of care established by 49 CFR §229.43 (a) also calls for measures to prevent locomotive diesel exhaust gasses that have been released outside the locomotive from entering into the locomotive cab.  More specifically, the standard of care states that the "exhaust stacks shall be of sufficient height or other means provided," to prevent diesel exhaust gasses from entering the cab "under usual operating conditions."   Typically, exhaust stacks located on top of the locomotive behind the cab and effective seals around windows and doors on the locomotive cab are some of the means for preventing entry of diesel exhaust gasses.   However, if the exhaust stacks were located directly in front of a window of a locomotive cab or the seals around windows or doors were defective and were found to allowed diesel exhaust gasses to enter the cab, such a condition would be unacceptable and would not meet the standard of care embodied in 49 CFR §229.43 (a).

An example of locomotive where the stacks appear to be of insufficient height to prevent diesel exhaust gasses from entering a locomotive cab appears to found in a photocopy of a photograph included in defendant's Exhibit 15F (page 725).   The photocopy was part of a file from the Industrial Hygiene Department of Conrail involving an investigation and air sampling of diesel exhaust gasses in response to a complaint about diesel exhaust fumes in the railroad's yard locomotives in Reading, Pennsylvania.  While the photocopy of the picture is of very poor quality, it appears to show exhaust stacks directly in front of the widow of the locomotive cab and it contains the notation:

> "Reading Yard:  Stacks on Engine are not high
>                 enough;  exhaust flows inside cab
>                 :Engine Built in 1972

Of course there may be <u>unusual</u> conditions where some amount of diesel exhaust gasses may enter a locomotive cab from outside the locomotive. In 1980, FRA issued a final rule in that revised the locomotive safety standards and separated then from the steam locomotive standards.  That final rule discussed the provisions of 49 CFR §229.43 (a) by noting the following:

> **§229.43 Exhaust and battery gasses**
> The final rule reflects a return to the language of the current requirement (§230.259) that means must be provided to prevent entry of products of combustion into the cab *under usual operating conditions*.  This change has been made because it is impossible to prevent the entry of some fumes into the cab in certain unusual wind and weather conditions. . . . (FR Vol. 45, No. 63, P. 21098 – Monday, March 31, 1980)

Thus, under certain "**unusual** **wind or weather conditions**," some diesel exhaust gasses may enter a locomotive; however, under normal operating conditions, such gasses must

be prevented from entering a locomotive cab.  For example, if a locomotive stops temporarily under a highway bridge and the wind conditions cause exhaust gasses to enter the cab.   If a limited amount diesel exhaust gasses were to temporarily enter a locomotive cab due to such unusual wind or weather conditions, the locomotive would still be considered to have met the standard of care described by 49 CFR §229.43 (a).

It must be noted that some railroads have alleged that the standard of care embodied by 49 CFR §229.43 (a) is met if diesel exhaust gasses inside a locomotive cab do not exceed exposure limits for various products of combustion established by the Occupational Safety and Health Administration (OSHA).  More specifically, some railroads have relied on a letter from Mr. Edward English, formerly of the FRA Office of Safety, to W.E. Honeycutt, Assistant Vice President - Operating Rules, Norfolk Southern Corporation dated April 4, 1996, that references the FRA's Locomotive Safety Standards, 49 CFR §229.43(a) and states:

> the phrase 'to prevent entry of products of combustion into the cab' only relates to the height of the exhaust stack . . . where exhaust gas accumulations in locomotive cabs are brought to FRA's attention, accepted methods of testing for gas is performed and if the readings are less than the standards set forth in the Occupational Safety and Health Administration regulations, no action is required. (NS Exhibit 23 – NS0001919-1920)

The contention in Mr. English's letter that the phrase "to prevent entry of products of combustion into the cab" only relates to the height of the exhaust stack is contrary to the plain language of the standard which clearly states, "Exhaust stacks shall be of sufficient height <u>or other means provided</u> to prevent entry of products of combustion into the cab" (Emphasis added).  Also, the contention that exhaust gas accumulations in locomotive cabs below OSHA exposure limits are acceptable is contrary to the plain language of the standard with clearly states "Products of combustion shall be released <u>entirely</u> outside the cab."   The standard of care set forth in 49 C.F.R. §229.43(a) makes no reference, whatsoever, to OSHA standards.

Moreover, FRA and OSHA issued a joint policy statement that delineates the regulatory jurisdiction of each agency as it applies to the railroad industry. In the joint statement, FRA made it crystal clear that OSHA exposure thresholds are not applicable to diesel exhaust gasses entering locomotive cabs.  FRA asserted that even small amounts of diesel exhaust gasses in locomotive cabs are an unacceptable hazard.   This Joint Policy Statement declares, in pertinent part:

> Toxic and Hazardous Substances (Subpart Z) - The **OSHA regulations apply** according to their terms, **except with respect to . . .the regulation of air contaminants in locomotive cab** and caboose environments. It is the judgment of FRA that the exposure of operating employees to air contaminants in the locomotive cab or caboose environment is an issue integrally related to the ability of employees to perform their duties and to the regulation of the rail equipment itself.  Thus air contaminant exposure in those particular environments must be viewed as a concern within two of the regulatory fields over which FRA has exercised jurisdiction (rail equipment, human factors). **Specific FRA regulations bearing on the locomotive cab environment address cab ventilation.** (49 CFR §230.229 (f) (2)) and exhaust gasses (49 CFR §230.259) . . .it is possible that situations may exist in which **short-tem exposure which meets OSHA**

> **standards may still affect the ability of employees properly to perform their duties** and many cause serious discomfort. (Emphasis added) (See: FR Vol. 43, No. 50, P. 10589 – Tuesday, March 14, 1978)

49 CFR §230.259 was subsequently recodified as 49 CFR §229.43(a) in 1980 when the FRA revised 49 CFR Part 230 by separating out provisions regarding non-steam locomotives and placing them in a new regulation 49 CFR Part 229. (See FR Vol. 45 No. 63 – Monday, March 31, 1980.)

It must be noted that no individual in the FRA Office of Safety has the authority to issue interpretations of federal railroad safety regulations or statutes. During my tenure as Associate Administrator, the FRA re-issued its policy statement to all Office of Safety personnel that every regulation should be given its plain meaning.  The regulation says what it means and means what it says.  Should a question arise regarding the meaning or intent of a federal railroad safety regulation, the question should be put to the FRA Office of Chief Counsel who would then issue written guidance regarding the interpretation of the regulation.  Also, the FRA may publish Technical Bulletins and Enforcement Manuals (also called Compliance Manuals) after Chief Counsel's approval, that contain official FRA interpretations of federal railroad safety regulations.

I have reviewed FRA MP&E Technical Bulletins and the Compliance Manual and have found no FRA interpretations regarding 49 C.F.R. §229.43(a) that supports the above referenced contentions in Mr. English's April 4, 1996 letter.   Mr. English is not, and was not, FRA Chief Counsel, nor did his letter come from the FRA Office of Chief Counsel. Therefore, the above referenced letter does not represent the interpretation or position of the FRA.

It is significant to note, that FRA Motive Power and Equipment (MP&E) Inspectors are responsible for enforcing the provisions of 49 C.F.R. §229.43(a).  During my tenure at FRA, MP&E inspectors had neither the training nor the equipment to monitor OSHA exposure level for diesel exhaust components or other airborne contaminates.

For example, in December 1994 FRA undertook a study of diesel exhaust gasses entering locomotive cabs from outside sources by monitoring diesel exhaust gas accumulation in locomotives travelling through a long tunnel as part of a study of locomotive safety.  To perform the study it was necessary for FRA to train the FRA inspectors how to use the equipment to perform the air sampling on 11 trains.  The air sample study results were published in FRA's Report to Congress – Locomotive Crashworthiness and Cab Working Conditions, (FRA Report) which stated, in pertinent part:

> - **Before any tests were conducted,** the Industrial Hygienist (IH) **provided each inspector with <u>instructions on how to use</u> and test the sampling air pumps** and test tubes.
> - Each inspector performed a 'dry run' of the testing that would be conducted in the tunnel.
> - The IH verified that each inspector could properly perform the test.
>    * * *

> - **MP&E inspectors conducted, prior to each run, the <u>normal locomotive safety inspection,</u> placing <u>emphasis on exhaust problems and/or leaks</u>.**
> * * * (Emphasis added) (FRA Report, Chpt. 7, P.12)

The FRA Report clearly illustrates that normal locomotive safety inspections include inspecting for exhaust leaks. Also, the fact that the FRA inspectors required training to use the air sampling test equipment prior to performing the air sampling required for the air quality study is a clear indication that air sampling is not a normal part of FRA locomotive safety inspections.

FRA Report also examined railroad employee injury reports involving air quality in locomotive cabs over a five year period and found the following:

> These data show that approximately 50 crew members per year report illnesses due to cab air quality resulting in almost 1000 days lost time per year. (FRA Report, Chpt. 7, P. 7-8)

Based on the foregoing, it is my opinion, within a reasonable degree of professional certainty within my area of expertise in railroad safety that:

1) The railroad industry standard of care established by the provisions of 49 C.F.R. §229.43(a) is clear on its face that locomotive diesel exhaust gasses must be "released entirely outside the cab" of the locomotive. Once diesel exhaust gasses have been released outside the locomotive, railroads must provide means to keep the exhaust gasses from entering the cab, including exhaust stacks of sufficient height and other means which typically include effective seals around cab doors and windows. The only exception to this standard of care is when "unusual operating conditions" such as unusual wind or whether conditions, cause some diesel exhaust gasses to enter a locomotive cab.

2) Some railroad's have alleged that the standard of care embodied by 49 CFR §229.43 (a) is met if diesel exhaust gasses inside a locomotive cab do not exceed exposure limits set by OSHA. More specifically, railroads have cited a letter from Mr. Edward English, formerly of the FRA Office of Safety, to W.E. Honeycutt, Assistant Vice President - Operating Rules, Norfolk Southern Corporation dated April 4, 1996 regarding that contention. However, these allegations are contrary to the plain language of the standard itself, which asserts diesel exhaust gasses shall be "released entirely outside the cab," and "means provided to prevent entry of products of combustion into cabs;"

3) No individual in the FRA Office of Safety has the authority to issue interpretations of federal railroad safety regulations or statutes. During my tenure as Associate Administrator, the FRA re-issued its policy statement to all Office of Safety personnel that every regulation should be given its plain meaning. The regulation says what it means and means what it says. FRA regulatory interpretations are issued in Technical Bulletins, Enforcement Manuals (Compliance Manuals), official interpretations from the Office of Chief Counsel. Having reviewed FRA Technical Bulletins and the Compliance Manual regarding Locomotive Safety Standards, no FRA interpretations have been found

regarding 49 C.F.R. §229.43(a) that support the above referenced contentions in Mr. English's letter;

4) Moreover, in a joint policy statement with OSHA, FRA made it clear that OSHA exposure thresholds are not applicable to diesel exhaust gasses entering locomotive cabs; rather, the aforementioned standard of care set forth in 49 CFR §229.43 (a) is applicable. FRA also indicated that even short term exposure diesel exhaust gasses in locomotive cabs is unacceptable;

5) Also, FRA MP&E Inspectors who are responsible for enforcing the provisions of 49 CFR §229.43(a) had neither the training nor the equipment to monitor OSHA exposure levels for diesel exhaust components or other airborne contaminates. For example, in December 1994, when FRA undertook a study of diesel exhaust gasses entering locomotive cabs from outside sources, which required air sampling to test for the products of combustion. FRA relied on its own MP&E inspectors to conduct the study but first it had to train them how to use the equipment to perform the air sampling. Also, prior to taking air samples on the locomotives, FRA stated the MP&E inspectors conducted "normal locomotive safety inspections" that emphasized, "exhaust problems and/or leaks." Thus, it is readily apparent that air sampling for OSHA exposure limits is not part of the normal locomotive safety inspections for diesel exhaust leaks.

## 6.2     Locomotive Conditions Reported by Mr. Newkirk

Another question to be considered is whether the conditions reported by Robert Newkirk while employed by the defendant railroads namely, the entrance of diesel exhaust gasses into locomotive cabs from underneath floor boards, through electrical cabinets, through heater blowers, and from outside air leaks around doors and windows, constitute violations of Federal Locomotive Safety Standard – 49 CFR §229.43 (a).

Locomotive diesel exhaust gasses that enter the locomotive cab through electrical cabinets and heater blowers most assuredly originated from exhaust leaks within the locomotive's engine compartment. This is especially true for modern locomotives with pressurized engine compartments. Therefore, locomotives in which diesel exhaust gasses that enter the cab through these routes do not meet the standard of care embodied in 49 CFR §229.43 (a) because the diesel exhaust gasses have not been "released entirely outside the cab."

Similarly, if diesel exhaust gasses from a locomotive are vented outside the locomotive but then enter the cab from air leaks in the seals around doors and windows under usual or normal operating conditions, said locomotive would not comply with the railroad industry standard of care embodied in 49 CFR §229.43 (a) because means were not provided to "prevent entry of products of combustion into the cab." Once again, if some diesel exhaust gasses from outside the locomotive entered the cab due to unusual operating conditions, such as unusual wind conditions, that locomotive would not be considered non-compliant with the standard of care set forth in 49 CFR §229.43 (a).

Based on the foregoing, it is my opinion, within a reasonable degree of professional certainty within my area of expertise in railroad safety that:

1) Locomotive diesel exhaust gasses that enter the locomotive cab through electrical cabinets and heater blowers are more likely than not to originate from exhaust leaks within the locomotive's engine compartment.  This is especially true for modern locomotives with pressurized engine compartments.  Therefore, locomotives in which diesel exhaust gasses that enter the cab through these routes do not meet the standard of care embodied in 49 CFR §229.43 (a) because the diesel exhaust gasses have not been "released entirely outside the cab;"

2) Furthermore, if diesel exhaust gasses from a locomotive are vented outside the locomotive but then enter the cab from air leaks around doors and windows under usual or normal operating conditions, said locomotive would not comply with the railroad industry standard of care embodied in 49 CFR §229.43 (a) because means were not provided to "prevent entry of products of combustion into the cab."   However, if some diesel exhaust gasses from outside the locomotive entered the cab due to <u>unusual</u> operating conditions, such as unusual wind conditions, that locomotive would not be considered non-compliant with the standard of care set forth in 49 CFR §229.43 (a);

### 6.3     Strict Liability Standard

The final question to be considered is whether the Federal Locomotive Safety Standards – 49 CFR §229.43 (a) is a strict liability standard which requires railroads to ensure that their locomotive cabs remain free of diesel exhaust gasses at all times when a locomotive is in service or offered for service, regardless of whether the railroad had prior knowledge of the diesel exhaust gas leaks.

Federal Railroad Locomotive Safety Standards do indeed constitute a standard of strict liability.   The railroad need not have prior knowledge of the locomotive defect for it to be in violation of the regulation.  Locomotives are required to be in compliance with the Federal safety standards at all times when they are in use or permitted to be used.  References to this strict liability standard can be seen FRA's Motive Power and Equipment Compliance Manual, which sets forth enforcement guidance that FRA provides to its MP&E safety inspectors.  Chapter 8 of the MP&E Compliance Manual, dated June 2012, addresses enforcement guidance related to the Locomotive Safety Standards - 49 CFR Part 229 and states, in pertinent part:

> A locomotive should comply with all the requirements of 229 and be free of <u>any</u> defects."
> [Emphasis in the original]  (FRA Motive Power and Equipment Compliance Manual P. 8-1)

FRA's enforcement guidance also states:

> Although **a railroad need not have knowledge of a non-complying condition on a locomotive to be assessed a civil penalty under the Locomotive Safety Standards,**

each Inspector is expected to use sound judgment along with the guidance outlined in the General Manual, when deciding whether the issuance of a violation report is appropriate under the circumstances." (FRA Motive Power and Equipment Compliance Manual P. 8-2)

A Federal railroad safety standard that allows assessment of civil penalties against a railroad for non-compliant conditions, without the railroad's prior knowledge of the non-compliant condition is the very definition of a strict liability standard. Therefore, the all the provisions of 49 CFR Part 229, including 49 CFR §229.43 (a) constitute a strict liability standard.

Based on the foregoing, it is my opinion, within a reasonable degree of professional certainty within my area of expertise in railroad safety that:

1) Federal Railroad Locomotive Safety Standards constitute a standard of strict liability. The railroad need not have prior knowledge of the locomotive defect for it to be in violation of the regulation. Locomotives are required to be in compliance with the Federal safety standards at all times when they are in use or permitted to be used;

2) References to this strict liability standard can be seen FRA's Motive Power and Equipment Compliance Manual -- Chapter 8, which states, "a railroad need not have knowledge of a non-complying condition on a locomotive to be assessed a civil penalty under the Locomotive Safety Standards." A Federal railroad safety standard that allows assessment of civil penalties against a railroad for non-compliant conditions, without the railroad's prior knowledge of the non-compliant condition is the very definition of a strict liability standard. Therefore, the all the provisions of 49 CFR Part 229, including 49 CFR §229.43 (a) constitute a strict liability standard.

**7.0 Prior Testimony**

I, George A. Gavalla, have been deposed or given trial testimony in the following cases during the past four years:

Trial: Lenford Lennon v. Waste Conversion Technologies, Inc, -- Docket No. NNI CV 10 6000807 S; Meriden, CT; January 30, 2013;

Deposition Testimony: Arispe et al. v. TIMEC Company, Inc., et al: Case No. NC043750; Los Angeles, CA; February 7, 2013;

Deposition Testimony: Estate of Timothy Anders v. Union Pacific Railroad: Case No 07-L-43; Windsor Locks, CT; March 27, 2013;

Deposition Testimony: Burrows v. CSX; Case No. 12 - 4139; Philadelphia, PA; June 12, 2013;

Deposition Testimony: Flores v. Amtrak et al: Case No. 3:12:CV-686-MEJ ; Oakland, CA June 27, 2013;

Deposition Testimony: *Palmer v. BNSF Railway Company; Case No. CV0297*; New York, NY; July 18, 2013;

Deposition Testimony: *Wallis v. BNSF Railway Company; Case No. 2:13-CV-00040-TSZ*; Boston, MA; September 19, 2013;

Deposition Testimony:  Kellogg v. BNSF Railway Company; Case No. *1:11- CV-7603*; Chicago, IL; September 23, 2013;

Trial: MelendRumeliote v. Port Authority Trans Hudson, *Case No. ESX-L7745-11*S; Newark, NJ; September 26 & 30, 2013;

Deposition Testimony: Rebollar v. LACMTA, *Case No. BC-421357*; Los Angeles, CA; January 9, 2014;

Deposition Testimony: Whitt v. BNSF, *Case No.8:12-CV-00358*; St. Louis, MO; January 16, 2014;

Deposition Testimony: White v. NJTRO, *Case No. 3:11-cv-00441;* Philadelphia, PA, February 4, 2014;

Trial Testimony *Wallis v. BNSF Railway Company; Case No. 2:13-CV-00040-TSZ*; New Haven, CT; February 25, 2014;

Deposition Testimony: Shuptrine v. Union Pacific, *Case No. 2012-49668*; Houston, TX; February 27, 2014;

Deposition Testimony: Casteel and Rickard v. CSX Transportation, Inc., *Case No. 12-C1-443*; Kansas City, MO; May 20, 2014;

Deposition Testimony: Randy Battenfeld v. BNSF Railway. *Case No. 1-CV-213-JED-PJC;* Hartford, CT; June 20, 2014;

Deposition Testimony: Sanch Rumeliote et. al. v. Union Pacific Railroad et al, *Case No. CV49117*; Dallas, TX; August 20, 2014;

Deposition Testimony: Estate of Andrew Haukereid v. Amtrak, *Case No. 3:13-cv-00092-DPN,* Hartford, CT; September 16, 2014*;*

Deposition Testimony: Jacob Keating v. Amtrak; *Case No. 34-2010-00074175;* Sacramento, CA; November 13, 2014;

Trial Testimony: Jacob Keating v. Amtrak, *Case No. 34-2010-00074175*; Sacramento, CA; November 14, 2014;

Deposition Testimony: Curtis Rookaird v. BNSF Railway Co., Case No. 14 CV-001-00176-RSL; Boston, MA, June 2015.

Deposition Testimony: Shawn Hall v. Illinois Central Railroad Co., *Docket No. CT-005310-12*; Preston CT, August 19, 2015;

Trial Testimony: Sean Palmer v. BNSF Railway, *Case No. CV0297;* Stockton, CA, October 2, 2015;

Deposition Testimony, David H. Brewer v. BNSF Railway Company*, Case No. CV-14-65-GF-BMM-RKS;* Norwich, CT, February 18, 2016;

Deposition Testimony, Stephan Gordon v. Illinois Central Railroad Company, *Case No. CT-005309-12,* Div. I; Preston, CT, March 18, 2016;

Deposition Testimony: Jeffrey Helmink v. BNSF Railway Co*.: Case No. DV-12-1207,* Boston, MA, April 13, 2016*;*

Trial Testimony: Shawn Hall v. Illinois Central Railroad Co., *Docket No. CT-005310-12*; Memphis, TN, May 11-12, 2016:

Trial Testimony: Curtis Rookaird v. BNSF Railway Co., *Case No. 14 CV-001-00176-RSL*, New Haven, CT, May 19, 2016;

Deposition Testimony: John Donahue v New Jersey Transit Rail Operations, Inc.: *Case No. 14-035673,* Philadelphia, PA, June 9, 2016;

Deposition Testimony: Estate of Carl Leroy Harris v. BNSF Railway Company*; Case No. CJ-2014-243,* East Hartford, CT, June 23, 2016;

Deposition Testimony: Mark Vandelune v. DM&E; Civil File No: 3:15-CV-03101-MWB; Hartford, CT, August 8, 2016;

Deposition Testimony: Michael Frost v. BNSF Railway Company; *Case No. 9:15-cv-00124-DWM*, Mashantucket, CT, August 9, 2016;

Deposition Testimony: Henry Lockhart v. Long Island Rail Road; *Civil Action No. 1:16-cv-1035*; New Haven; CT; August 12, 2016;

Trial Testimony: Jeffrey Helmink v. BNSF Railway Company: *Case No. DV-12-1207*; Billings Montana, September 8, 2016;

Deposition Testimony: Jeffrey Rohr v. BNSF Railway Company: *Cause No. DV 14-*

*1219;* East Hartford, CT, September 27, 2016;

Deposition Testimony:  Jamey Murphy et al. v. Town of Darien et al.; Case No. CV-13-6039787-S; North Haven, CT, October 12, 2016;

Deposition Testimony: Nathan Scott Johnson v. City of Tacoma, Dept. of Tacoma Public Utilities, Tacoma Rail; Case No. 15-2-14412-5; New London, CT, October 21, 2016;

Deposition Testimony:  Alexander B. Carrick v. Wisconsin Central LTD; Case No. 2014 CV-000326; New York, NY, October 24, 2016;

Deposition Testimony: Steve Gordon v. Norfolk & Portsmouth Public Belt Line; Case No. CL 15005959-00; Portsmouth, VA, November 9, 2016.

**8.0 Signature**

The opinions contained herein are based on my background, education, experience and information provided thus far and are stated within a reasonable degree of professional certainty within my area of expertise in railroad safety.  I reserve the right to amend or supplement this report if additional information is made available.

Submitted:          December 11, 2016

By:          George A. Gavalla,
             11 Cherry Hill Road
             Norwich, CT 06360

## APPENDIX A          CURRICULUM VITAE  - GEORGE A. GAVALLA

11 Cherry Hill Road — Norwich, CT 06360
Tel. (860)-886-8104 — Cell (860) 912-5144
Ggavalla@aol.com

*PROFILE*    **National railroad safety executive.  Program architect, leader, and negotiator.  Skilled troubleshooter. Senior US Government leader with corporate and union experience.  International background as consultant and liaison.  Broad intellectual perspective.**

- 38 years' railroad safety experience in positions of strategic and leadership responsibility.

- President Triad Consulting, a railroad safety and security consulting firm with affiliates in every railroad operating discipline.

- Former Associate Administrator for Safety, Federal Railroad Administration (FRA).  Head of the agency's Office of Safety, directed the Federal government's railroad accident investigation, safety inspection and safety enforcement programs. Led large scale comprehensive safety investigations on the major railroad's in the U.S. to identify safety risks and implement safety improvement action plans.  Senior FRA liaison to industry leaders, White House, Federal agencies, the Congress and State legislatures.

- Has testified before Congress, the National Transportation Safety Board, and other federal and state agencies regarding railroad safety matters.

- Multiple appearances and interviews on CNN, 60 Minutes II, National Public Radio,  New York Times, Washington Post, and numerous other news media outlets as a rail safety and security expert.

- During my tenure as head of the Office of Safety, the railroad industry achieved the lowest levels of rail-related fatalities and injuries in its history, all rail-related fatalities fell by 19%, employee fatalities by 48% and grade crossing fatalities by 28%. Also led FRA's most productive era for promulgation of new safety standards and regulations.

- Advanced studies in International Relations and History, Georgetown University.

- Served as Director of Research, Brotherhood of Railroad Signalmen, National Headquarters (1991-95).  Assistant General Chairman, Brotherhood of Railroad Signalmen (1984-91). Connecticut State Legislative Representative (1989-91). Hands-on experience as Communications and Signal Maintainer, Consolidated Rail Corporation (1976-84). Congressional Intern, U.S. House of Representatives (1974).

- *"….significant factor in improving safer procedures and practices in the industry…. strong leadership…ability to hear all sides….primary Office of Safety spokesman…. explaining the budget requests to Congressional*

*committee staffers and OMB budget officials....outstanding*
*results....superb work...."   (from official Evaluations)*

*RESULTS*

**RAILROAD SAFETY LEADER — NATIONAL & INTERNATIONAL EXPERIENCE**

Comprehensive railroad safety leadership experience.  International reputation for successfully advocating, designing, negotiating and executing effective safety strategies.

RESULT

- Facilitated multi-disciplinary hazard analysis/risk assessment of railroad signal system and highway-rail grade crossing systems for a new start light rail transit operation in Texas

- Conducted a comprehensive safety assessment of switching operations for a railroad serving one of the world's largest oilfields in Kazakhstan.

- Co-authored a hazard identification study of Remote Control Locomotive operations and technology.

- Directed an in-depth FRA analysis of railroad safety data, identifying risk factors and chronic problems.  Persuaded top level railroad executives, rail labor leaders, and railroad suppliers to work with FRA in initiating and executing industry-wide safety programs.

- Led a 48-member FRA Rail Safety Advisory Committee to assist FRA in developing nine new safety regulations, and several proposed regulations, including the agency's first performance-based regulations.

- Led FRA initiative to develop safety guidelines for remote control locomotive technology and led industry-wide task force oversee the safe implementation of remote control locomotive technology.

- Created FRA's first formal Fatigue Mitigation Program and personally led the adoption of fatigue mitigation programs across the railroad industry.

- Convened a combined task force of industry and union leaders to work with FRA in reducing accidents in train yard/switching facilities—lead to a 50% reduction in fatalities and an 18% reduction in accidents.

- Initiated Safety Compliance agreement with CSX that lead to large decrease in track caused train accidents.  Lead a large scale safety assessment of Union Pacific that helped reduce the number of rail fatalities by 75 % in one year.

- Led FRA in creating an exchange program with Japan Central Railways.  Led rail safety exchanges and meetings with railway officials from Russian Federation, Australia, UK,

Safety Analysis Report 12/11/2016                                                    18

India, Poland, Romania, Iraq, Nigeria, People's Republic of China, and Japan.

*2004-Present*      **President — Triad Railroad Consulting**

Norwich, CT

Provide executive direction to a multi-disciplined team of affiliated railroad safety and security experts in the following rail related areas: safety and security risk assessments and hazard analysis, regulatory compliance, safety and security research, accident investigation and analysis, litigation consulting.

RESULT
- Facilitated multi-disciplinary hazard analysis/risk assessment of railroad signal system and highway-rail grade crossing systems for a new start commuter rail operation in Texas
- Conducted a comprehensive safety assessment of switching operations on a
  railroad in Kazakhstan that is the world's largest crude oil carrier and has
  94% of its traffic in hazardous materials.
- Developed and conducted rail safety training classes for switching operations and railcar inspections.
- Co-authored a hazard identification study of Remote Control Locomotive operations with a lead railroad expert who has published more than 100 books and articles on railroad safety and operations.
- Railroad accident analysis in cases involving Federal regulatory compliance, operating and safety rule compliance, remote control Locomotive Operations, signal operations, highway-rail grade crossings, switching activities and safety appliances.

*1997-2004*      **Associate Administrator for Safety — US Government Senior Executive Service**

Federal Railroad Administration — Washington, DC

Provide nationwide leadership in building alliances to plan and implement strategies and formal regulations to improve railroad safety throughout the United States.  Provide frequent consultation with union and industry leaders worldwide.

RESULT
- Successfully led an industry-wide effort for adoption of fatigue mitigation policies—including the first railroad policy that gives train crews at least one day each week of guaranteed rest.
- Chaired FRA safety inquiry into remote control locomotive technology and led FRA team that issued the FRA's first recommended safety guidelines for the operation of remote

control locomotives.   Subsequently organized and led an industry-wide task forces to oversee the safe implementation of remote control locomotive technology.

- Led FRA Grade Crossing Safety Program and initiated a Law Enforcement Liaison Program in FRA Regional offices, sponsoring local police to promote safety laws for highway-rail crossings.  Grade crossing accidents fell 24% and crossing fatalities fell 28% during this period.

- Led an FRA study of the safety of the Amtrak railroad tunnels into New York City and testified about tunnel safety at hearing for New York State Senators.

- Studied German joint freight/transit rail operations in using the same rail line, in preparation for promulgation of a new FRA policy on shared use of railroad track between light rail transit operator and freight railroads.  Authored the rail safety segment of a pioneering Federal Transit Administration report on this issue.

- Founded the Switching Operations Fatality Analysis (SOFA) task force of industry and union leaders which worked with FRA in reducing train yard accidents and switching facilities—led to a 50% reduction in fatalities and an 18% reduction in accidents.

*1995-1997*    **Railroad Safety Project Coordinator — GS-15**
Federal Railroad Administration — Cambridge, MA

Served as FRA Project Coordinator on Amtrak and the Long Island Railroad, NY, the largest commuter railroad in the country.  Conducted large scale assessments of passenger rail operations and safety.  Directed development and implementation of action plans to improve passenger rail and highway-rail grade crossing safety.

RESULT  • LIRR grade crossing failures reduce by 2/3rds, employee injuries fell 23%

- Amtrak employee injuries declined 30%.

- Led trips to Japan and Germany for investors exploring state-of-the-art rail technology, including Magnetic Levitation (MagLev) technology, led to U.S. investments in MagLev. Worked with Japan Ministry of Railways and U.S. Embassy to obtain previously unreleased documents that established Japanese safety requirements for MagLev.

*1991-1995*    **Director of Research —** HQ, Brotherhood of Railroad Signalmen — Mt. Prospect, IL

Directed a wide-ranging research program impacting contract negotiations, safety issues, and the introduction and assessment of railroad signal and communications technologies.

RESULT
- Served as the organization's primary liaison to the FRA on railroad safety issues.
- Initiated and led a campaign that persuaded FRA to issue regulations protecting railroad workers from being struck by trains. Within two years, roadway worker fatalities had been reduced by 60% and fell to zero in 2004.
- Granted Special Observer status in National Transportation Safety Board hearings for the most deadly Amtrak accident in history at Saraland, Alabama in1993. Submitted written report into the NTSB accident record regarding causal factors and preventative measures.

*1984-1991*   **Assistant General Chairman —** Brotherhood of Railroad Signalmen — Lancaster, PA

RESULT
- Negotiated contracts with seven railroads. Managed contract disputes and represented BRS at settlement conferences and before arbitration panels.
- Successfully lobbied Connecticut State Legislature for passage of the nation's first mandatory highway-rail grade crossing safety standards.

*1976-1984*   **Communications/Signal Maintainer** — Consolidated Rail Corporation — Harrisburg, PA

RESULT
- Inspected, tested, repaired and built railroad communications and signal systems and highway-rail grade crossing warning devices on both freight and passenger railroad lines in Washington, DC, Maryland, Virginia, Pennsylvania and Delaware.

**Education**

*2000 -*   **Harvard University – Kennedy School of Government** – Cambridge, Massachusetts

- Executive Training Course - Effective Decision Making

*1998 -*   **Federal Executive Institute** - Charlottesville, Virginia

- Graduate – Senior Executive Service Program

*1971-1976*      **Georgetown University** — Washington, DC
                             • Bachelor of Arts Program – History Major

**Professional Affiliations:**

*2005 – Present*      **National Association of Railroad Safety Consultants and Investigators**

2009 – Present      **American Society of Civil Engineers** – Affiliated Member

2013 – Present      The **Air Brake Association** -- Member

## APPENDIX B                                    Fee Schedule

**Consultant**: George Gavalla

|  |  |
|---|---|
| **In the Matter of :** | **Robert Newkirk v Consolidated Rail Corp., et al Case No. 1:16-cv-332; In the United States District Court, Western District of Michigan, Southern Division** |

**Fees and Charges:**

- Retainer Fee                  Applied against hourly charges        $3,000

- Investigation/ Research:                                           $250/Hour
  Includes site visits,
  report writing, consultation

- Deposition Testimony:                                              $300/Hour
  Includes courtroom and
  office preparation and
  waiting time

- Trial Testimony:                                                   $300/Hour
  Includes courtroom and
  office preparation and
  waiting time

- Travel Time:                                                       $100/Hour
  For time spent in actual transit
  while away from home office

- Direct Expenses:                                           Actual Expenses
  Includes air fares, taxi, lodging,
  $50 per diem for meals & incidental
  expenses while on travel, mileage
  rate for use of personal auto at the
  highest rate allowed by the IRS,
  document reproduction, mailing
  and other reasonable and
  necessary expenses

## Appendix C

### Documents Reviewed Re:

**Robert Newkirk v Consolidated Rail Corp., et al
Case No. 1:16-cv-332; In the United States District
Court, Western District of Michigan, Southern
Division**

1) 49 CFR Part 229 – Railroad Locomotive Safety Standards;
2) Final Rule Re: 49 CFR Parts 229 and 230 – FR Vol. 45, No. 63;
3) FRA Motive Power and Equipment Compliance Manual – Chapter 8;
4) Report to Congress – Locomotive Crashworthiness and Cab Working Conditions –
September 1996;
5) Railroad Occupational Safety and Health Standards; Termination – Policy Statement –
FR Vol. 43, No. 50 – Tuesday, March 14, 1978.
6) Complaint and Jury Demand;
7) Case Management Order;
8) Plaintiff's Initial Disclosure;
9) Plaintiff's Answers to Defendant's Interrogatories;
10) Plaintiff's Response to Defendants Request for Documents;
11) Defendant Conrail's Initial Disclosures – Exhibits 13 & 15.A – 15.P;
12) Defendant Norfolk Southern Railway Company's Initial Disclosure – Exhibits 18,
21.F – 21.K & 23.